Nott, J.,
delivered the opinion of the court:
In 1838 the condition of the Cherokee people was this:
The Western Oherokees inhabited that portion of the Indian Territory which had been ceded to them by the treaty 1828. They are believed to have been about 6,000 in number, having a governor, a legislative assembly, statute laws, and the autonomy which has been and is now exercised by the different nations in the Territory. They had made treaties with the United States in 1817 and 1819, by which they acquired lands in Arkansas, and had receded those lands in exchange for others in the Indian Territory in 1828, and had corrected the boundaries of the latter by another treaty in 1833, and they were as fully recognized as a body politic as any other of the limited Indian governments which theUnited States recognized through the medium of treaty obligations.
The Eastern Cherokees were prisoners in Georgia, under the guard of 6,000 United States soldiers, who had hunted them down from their mountains and driven them out of their valleys and were now bringing them to the terms of an enforced emigration. In numbers they were believed to be about 18,000. They also had hada national autonomy; their individual rights and duties were prescribed by printed statutes; they had possessed schools, farms, orchards, and had so far progressed in the arts of civilization as to have established ferries and built turnpike roads and imposed tolls. They likewise had been recognized by the United States as a body politic, capable of entering into the obligation of a treaty-making power.
Within the mass of the Eastern Cherokees there was or had been a small body of men exceptionally friendly to the United States, who, by aiding the Government in its attempt to obtain a peaceable emigration from Georgia, and more especially by assuming to execute the treaty of New Echota, on behalf of the Eastern Cherokees, had brought down on themselves the suspicion and enmity of nearly all their race. Their political leaders were Eidge and Boudinot, and they were known as *21 the treaty party. But between 1835 and 1838, that is to say, between tbe treaty of New Ecbota and the forcible removal of the Eastern Cherokees, the greater part of these Indians had voluntarily emigrated to the Indian Territory and merged with the Western Cherokees.
The Eastern Cherokees had been controlled by a chief whose intellectual successes deserve to be ranked among the extraordinary achievements of diplomacy, if not of statesmanship. For eight years he had maintained a contest with both the Government and the State of Georgia in the field of intellectual resource — objecting, procrastinating, evading; sometimes invoking moral forces, sometimes foreshadowing forceful resistance, and again and again he had achieved the negative triumph of frustrating the emigration of his people. And it is not a trivial element of the case that for six years his resistance was effectual against the iron determination of Andrew Jackson. The Indian name of this leader was Koo-weskoowe, but he is generally known only by his adopted name of John Eoss.
In 1836 the Government, apprehensive of collisions with the people of Georgia, and weary of being thwarted in the diplomatic field, sent a military force to bring negotiations to an end and effect a forcible removal. The commander was an officer of what is termed the old school, a strict disciplinarian, who deemed it the highest duty of a soldier to obey orders, but almost immediately he seems to have passed under the strategic magnetism of Eoss. Insensibly, unconsciously, in feeling and judgment, he went over to the Indians’ side. His first dispatch was in these terms :
“Headquarters, Talley Town, N. 0.,

August 1,1836.

“Sir: I arrived at this place on the 29th instant with five companies.
“Marrow, with his company, reported himself ten miles off; he had made a circuit of two hundred and fifty miles. The feeling and disposition of the Indians are altogether adverse to removal; I have had two meetings on the subject without any decision. On Wednesday next we have another, when I expect a large number will be present; it will then be determined whether they will go peacefully or by force. If they hesitate, I will take them. Under any circumstances I shall take hostages.
*22 “I am so constantly engaged that I have little time to writej I am day and night employed.
“I have the honor to be, very respectfully, yours, etc.,
“John E. Wool,

“Brig. Gen., Commanding.

“To the Major-General Commanding- the Army.”
In less than two months he wrote as follows:
“Headquarters Army, E. T. and O. N.,

“Bed Clay, Sept. 25, 1836.

“Sir: * * * During the whole period of holding the council the Cherokees appeared pacific in their language and conduct, and generally conducted themselves with as much order and propriety as the same number of men assembled in any part of the United States would have done.
“I have the honor to be, very respectfully, your obedient servant,
“John E. Wool,

“Brig. Gen., Commanding in the CheroTcee Country.

“ To the Hon. Lewis Gass,
“ Secretary of WarP
And in less than five months more he wrote:
“Headquarters Army, 0. N.,

“New Bchota, Georgia, Féb. 18,1837.

“Sir: * * * After they had voted I liad them called together, when I made a short speech to them. It is, however, in vain to talk to a people almost unanimously opposed to the treaty and who uniformly declare that they have never made the treaty in question, and if one has been made with the United States it was done without the consent of the nation, and by a few unauthorized individuals, aided and assisted by corrupt agents of the Government. So determined are they in their opposition that not one of all those who were present and voted at the council held but a day or two since at this place, however poor or destitute, would receive either rations or clothing from the United States, lest they might compromit themselves in regard to the treaty.
“The same people, as well as those in the mountains of North Carolina, during the summer past, preferred living upon the roots and sap of trees rather than receive provisions from the United States; and thousands, as I have been informed, had no other food for weeks. Many have said they will die before they will leave the country.
I am, very respectfully, your obedient servant,
“John E. Wool,

“Brig. Gen., Commanding in C. Nation.

“To Major M. M. Payne.” ,
*23 For twenty months the troops did not move, and the eviction did not begin.
In 1837 the Government fixed the 23d of May, 1838, as the time, and sent Gen. Scott with reenforcements and positive orders. He moved quickly and successfully, and has thus recorded the most painful experience of his military life:
“Food in abundance had been provided at the depots, and wagons accompanied every detachment of troops. The Georgians distinguished themselves by their humanity and tenderness. Before the first night thousands — men, women, and children, sick and well — were brought in. Poor creatures. They had obstinately refused to prepare for the removal. Many arrived half starved, but refused the food that was pressed upon them. At length the children, with les's pride, gave way, and next their parents. The Georgians were the waiters on the occasion, many of them with flowing tears. The autobiographer has never witnessed a scene of deeper pathos.”
The treaty of New Echota is the root from which controversies innumerable, involving force, bloodshed, diplomatic negotiations, Congressional action, and judicial determination have for more than half a century been springing. Its history is this:
The first act for the removal of the Cherokees was the treaty of 1817. Under it several thousand had emigrated in a few years to a reservation within the present boundaries of Arkansas and become known as the Western Cherokees. Their portion of the country was surrendered to the United States, but border rapacity had intruded on the lands of the remaining Cherokees — more than five hundred farms, it is said, were occupied by white people — and demanded the removal of the entire people and the opening of 5,000,000 acres for settlement. The Cherokees on their side protested against the invasion of their country by these intruders and demanded that they be removed.
In 1830: “ The United States, in order to avert the evils and unhappy difñculties that now exist, and are likely to continue, between the Cherokee Indians and the United States, and with a view to promote the future peace and happiness of all concerned, propose to enter into a contract or treaty on the following terms.” Such was the preamble of the agent of the United States, Col. John L. Lowrey, October 20, 1830, to the proposition which followed it. First. That the United *24 States should give them a country west of the Mississippi equal in value to their own. Second. That they should allow to each and every warrior and widow a reservation of 200 acres, for which the United States should pay a fair price if ultimately abandoned. Third. That they should allow to Indians who should choose to become citizens, being able to sustain themselves, a reservation in fee simple. Fourth. That they should “remove those who should choose to emigrate, at the expense of the Government, and furnish them with provisions one year after they arrive at their new homes, and also pay them for all their stock, except horses and other personal property, which they may choose to take with them, thereby giving them a perfect choice to go or stay, and in either event to be provided for as above described.”
A liberal school fund was also to be added, to be vested in the hands of such trustees as should be worthy of trust, “that the rising generation should thereby be enabled to improve in useful learning, together with such annuities as they be thought entitled to, compared with those that have been afforded to other nations.”
These propositions were submitted to the general council then in session, and two days later Boss communicated its decision in a note characteristic of the clearness, terseness, and dignity which ran through all of his diplomatic writings:
“New Echota, G. N., October 22, 1830.
“ Sir : The general council have deliberated upon the subject of your propositions, submitted through me for their consideration, and the inclosed document contains the result of that deliberation, which is submitted for your information.
“The Clierokees have long since come to the conclusion never again to cede another foot of land, and of this determination there is abundant proof among the public documents in the offices of the General Government. The President was addressed upon this subject fully at Nashville last summer through the agent, and they now only ask from the General Government the protection of those rights which have been solemnly guarantied to them under former treaties.
“The offer of new guaranties can be no inducement to treat.
“I am, sir, etc.,
“John Boss.
“Ool. John Lowrey,
“ Special Agent.”
*25 At tbe beginning of 1835 tbe Oherokees were still in tbe Southern States, and no treaty for tbeir removal bad been made. But tbe Government bad then brought to the work of negotiation a less scrupulous representative, and be, failing to accomplish anything with tbe constituted authorities of tbe Cherokee Nation, devised a scheme which he thus sketched in an official report to his superior, the "Commissioner of Indian Affairs:
“ Bed Clay Council Ground, October 27,1835.
“ I have now just opened negotiations with them, and I hope to come to a treaty, now I have commenced; but there are still many difficulties in the way, and the only way I have of accomplishing it now is the fear of the Indians of Georgia legislation. Alabama and Tennessee, I think, will also pass some wholesome laws to guieken their movements.
“I have the council which the commissioners were authorized to call still in reserve, and if I am broke up here I shall notify these gentlemen that they will not be received at Washington, and that they must treat here or nowhere, during General Jackson’s administration, and at the proper time, when the legislature begins to press the call, then convene at New Echota.
“With great respect, your obedient servant,
“ J. F. SOHERMERHORN,
“ Com. to treat with Oherokees east.
“To the Hon. Elbert Herring-, Commissioner.”
This scheme was effectually carried out. An assemblage of Indians, estimated at from two to three hundred meu, women, and children, under the influence of Bidge and Boudinot, were brought together at New Echota, and twenty of these signed the treaty, not one of whom possessed official or delegated authority. At the same time the commissioner succeeded in getting two Western Oherokees to sign the certificate of approval on behalf of the Western Cherokee Nation, which appears appended to the treaty (7 Stat. L., p. 487). Their authority as delegates has not been shown and their mission, if any, was undoubtedly to counsel the Eastern Oherokees against the treaty, and it moreover appears by a voucher on file that the commissioner paid them $1,500 “for their trouble and expenses.” Their action was afterwards ascribed by themselves to ignorance, persuasion, and bribery and was immediately and always disavowed by the Western Oherokees.
Thus on the 29th of December, 1835, the treaty at New Echota was executed.
*26 On tbe 3d of February following a general council was convened, which, unanimously adopted a resolution setting forth—
“That having been informed that certain individuals of the Cherokee Nation, after having organized themselves into a body and calling themselves a general council, did, on the 28th or 29th of December last, at New Eehota, enter into an agreement or treaty with John F. Schermerhorn, commissioner on the part of the United States, ceding away the entire lands of the Cherokee Nation east oi the Mississippi to the United States, contrary to the known will and declaration of a large majority of the Cherokee people and without any authority whatever from the authorities and people of the Cherokee Nation so to act.”
Wherefore the resolution proceeds:
“We do most solemnly protest before God and man and of its ratification by the Senate of the United States, as we are determined never to acknowledge any acts of individuals without authority to treat away the most sacred rights and dearest interests of the Cherokee people.”
On the 5th of March following Maj. William M. Davis, the enrolling and appraising agent of the United States, thus reported to the Secretary of War, and the accuracy of his statement is confirmed by Lieut. Hooper, one of the witnesses who attested the treaty:
“ Cherokee Agency, East, 5th March, 1836.
“ Sir : In 1831 I had the honor to receive from your hands the appointment of enrolling and appraising agent in the removal of the Cherokees west of the Mississippi.
# ******
“ Sir, that paper, containing the articles entered into at New Eehota in December last, called a treaty, is no treaty at all, because not sanctioned by the great body of the Cherokee people, and made without their consent or participation in it pro or con; and I here solemnly declare to you, without hesitation, that upon a reference of this treaty to the Cherokee people it would be instantly rejected by more than nine-tenths of them; in fact, 1 incline to the belief that nineteen-twentieths would rise up against it. I was not present at the meeting at New Eehota, being prevented by indisposition. But, sir, I have it from the best authority that there were not present at the meeting more than a hundred voters, and in all, including men, women, and children, not exceeding three hundred souls.
*27 “The Cherokee people are a peaceable, harmless people, but you may drive them to desperation ; and this treaty can not be carried into effect except by the strong arm of force.
“With very great respect, I have the honor to subscribe myself your most obedient servant,
“Wm. M. Davis.
“Hon. Lewis Cass,
“ Secretary of War, Washington Oity.n
On the 28th September of the same year, the national committee and council, in general council assembled, again declared that the treaty of New Echota was not the act of the Cherokee people, and hopeless of redress from the Executive, addressed a memorial to Congress, which among other things set forth:

uTo the honorable the Senate and House of Representatives of the United States of America, most respectfully and most humbly showeth:

“That your memorialists and chiefs, national committee and council, and people of the Cherokee Nation, in general council assembled, solicit permission to approach your honorable bodies under circumstances peculiar in the history of nations, circumstances of distress and anxiety beyond our power to express. We earnestly bespeak your patience, therefore, while we lay before you a brief epitome of our griefs.
“The instrument in question is not the act of our nation; we are not parties to its covenants; it has not received the sanction of our people. The makers of it sustain no office nor appointment in our nation under the designation of chiefs, headmen, or any other title by which they hold or could acquire authority to assume the reins of government and to make bargain and sale of our rights, our possessions, and our common country. And we are constrained solemnly to declare th at we can not but contemplate the enforcement of the stipulations of this instrument on us against our consent as an act of injustice and oppression which we are well persuaded can never knowingly be countenanced by the Gfovernment and people of the United States, nor can we believe it to be the design of those honorable and high-minded individuals who stand at the head of the Government to bind a whole nation by the acts of a few unauthorized individuals. And therefore we, the parties to be affected by the result, appeal with confidence to the justice, the magnanimity, the compassion of your honorable bodies against the enforcement on us of the provisions of a compact in the formation of which we have had no agency.
“In truth, our cause is your own; it is the cause of liberty and of justice; it is based upon your own principles, which we *28 have learned from yourselves, for we have gloried to count your Washington and your Jefferson our great teachers; we have read their communications to us with veneration; we have practiced their precepts with success. And the result is manifest. The wilderness of the forest has given place to comfortable dwellings and cultivated fields, stocked with the various domestic animals. Mental culture, industrious habits, and domestic enjoyments have succeeded the rudeness of the savage state. We have learned your religion also. We have read your sacred books. Hundreds of our people have embraced their doctrines, practiced the virtues they teach, cherished the hopes they awaken, and rejoiced in the consolations which they afford. To the spirit of your institutions, and your religion, which has been imbibed by our community, is mainly to be ascribed that patient endurance which has characterized the conduct of our people under the laceration of the keenest woes. For assuredly we are not ignorant of our condition; we are not insensible of our sufferings. We feel them, we groan under their pressure, and anticipation crowds our breasts with sorrows yet to come.”
The only answer that was made to this memorial came in the form of a dispatch from the Acting Secretary of War to 'Gen. Wool:
“War Department, October 12,1836.
“I am instructed to express the surprise of the President that you permitted the council of the Oherokees to remain in session a moment after it became apparent that it was determined to declare the treaty void.”
The treaty of New Echota, therefore, was the act and deed of neither the Eastern nor Western Oherokees.
Boss had been chosen principal chief of the Oherokees in 1828, and for ten years performed with astonishing ability two disinct and difficult tasks — that of repelling and outwitting the treaty-seeking agents of the United States, and that of keeping a wild, impulsive people, deprived of their annuities and maddened by repeated aggressions of the border whites, from becoming the aggressors. A confidential agent of the War Department, sent to ascertain the truth of various matters, reports in September, 1837—
“ Though unwavering in his opposition to the treaty, Boss’s influence has constantly been exerted to preserve the peace of the country; and Ool. Lindsay says that he alone stands at this time between the whites and bloodshed.”
When the removal of the Oherokees began all that Boss had struggled to prevent was accomplished, and the accom- *29 plisbment bad demonstrated to tbe Indian mind a power tbat was irresistible. His policy of negotiation, procrastination, and appeal to moral forces bad resulted in a disaster wbicb bad driven every family ont of tbeir own borne and every man out of bis own country. In a word, bis pobcy seemed a mistake, bis public career finished, and bimself utterly overthrown. An ordinary man so overthrown would have bowed bis bead and acknowledged tbat bis life-work bad ended.
But it is at this point tbat bis success begins. Where tbe rest of bis nation saw only humiliation and submission be saw an opportunity, audacious but practicable, and with a skill and readiness that belong to tbe marvels of political biography, in less than two months be gave to it form and effect, and changed tbe future into an enduring victory and made tbe past a transitory defeat. On tbe 1st August, 1838, while tbe dispirited throng of Cherokee exiles paused in tbeir march at a temporary baiting place tbe name of wbicb does not appear on tbe map nor in tbe list of post-offices, and wbicb is known only from what transpired there as Aquohee camp, be framed a declaration of rights wbicb secured and has ever since retained tbe autonomy of tbe Eastern Cherokee's.
Tbe instrument, after again declaring tbat tbe Eastern Cberokees were not a party to tbe pretended treaty of New Ecbota and will forever demand redress for tbe wrongs and injuries wbicb have been brought upon them by tbe United States, sets forth in terms wbicb will bear tbe scrutiny of scholars in modern international law tbat—
“Whereas tbe Cherokee people have existed as a distinct national community in tbe possession and exercise of tbe appropriate and essential attributes of sovereignity for a period extending into antiquity beyond tbe dates and record and memory of man;
“And whereas these attributes, with tbe rights and franchises wbicb they involve, have never been relinquished by tbe Cherokee people, but are now in fall force and virtue;
“And whereas tbe natural, political, and moral relations subsisting among tbe citizens of the Cherokee Nation towards each other and towards tbe body politic cannot, in reason and justice, be dissolved by tbe expulsion of tbe nation from its own territority by tbe power of tbe United States Government:
“Resolved, therefore, by the national committee cmd council and people of the Oherolcee Nation, in general council assembled, Tbat the inherent sovereignty of tbe Cherokee Nation, to *30 gether with, tbe constitution, laws, and usages of tbe same, are, and by tbe authority aforesaid are hereby declared to be, in full force and virtue, and shall continue so to be in perpetuity, subject to such modifications as tbe general welfare may render expedient.”
When tbe column of captives or immigrants, whichever they were, entered tbe Indian Territory tbe Western Cbero-kees, who bad been passing hospitable and kindly resolutions of welcome, were astounded by tbe intimation that their government was to come to an end, and that they themselves as a people would be lost and merged in tbe greater mass of tbe intruders, and that thenceforth tbe constitution and laws and government of tbe Eastern Cberokees would reign over them. Tbe position taken by Eoss did not indeed go so far as this in terms. He maintained, first, that tbe Cherokee people by their enforced removal bad lost nothing of their inalienable right of sovereignty; second, that it was impossible that two distinct sovereignties could exist in tbe same territory; third, that a general council of all tbe Cberokees, Eastern and Western, should frame a new constitution for tbe government of all.
Tbe Western Cberokees maintained that they were possessed of their own country, purchased with their own money, subject to their own laws, ruled by their own constituted authorities, and that the coming of tbe Eastern Cberokees, uninvited so far as they were concerned, could not overthrow their existing constitution and government. Either party’s deductions were right from their own premises. The trouble was that the two were utterly irreconcilable, and the certainty was that if the Western Cherokees acceded to the seemingly fair proposition of Eoss to hold a council and frame a government for all, they would immediately be swallowed up in the overwhelming majority of the Eastern Cherokees.
Eoss never varied the simplicity of his first position, a position which he maintained with calmness and dignity and invincible firmness.
The military commander at Fort Grib son and the Indian agent of the Government remonstrated, and he replied:
“Park Hill, June 30,1839.
“Gentlemen: We perfectly coincide with your judgment that two governments can not and ought not to exist in the Cherokee Nation any longer than arrangements can be made *31 for uniting tbe two communities, and in conforming with these views we have used our best endeavors to bring about this desirable event in a manner which might be satisfactory to all parties, and by which all rights might be provided for and the peace and wellbeing of the Cherokees permanently secured.
“We have claimed no jurisdiction over our W estern brethren, nor can we, consistently with the responsibilities with which our constituents have invested us, recognize their jurisdiction over us.
“ When they refused to mingle councils with us for free conversation on our affairs, and requested that our wishes might be reduced to writing, we offered to meet them on equal ground. But our just and reasonable overtures were unconditionally rejected by them and our communication treated with contempt. We have no disposition, however, to stand upon punctilios, but what are we to understand by the propositions, now made, and even these, rigorous as they are, it appears are yielded with reluctance through your influence and at your instance. Is it required that the late emigrants relinquish all their rights and appear before the Western chiefs in the attitude of suppliants? If such be their wish, and we know not how otherwise to construe their words, we are compelled to say that we do not believe our brethren, the Western people, have the least desire to reduce us to so abject a condition. Indeed, they have expressed their sentiments, and in the exercise of their inalienable and indefeasible rights have appointed a national convention for Monday, July 1, 1839; and, for ourselves, we are unable to perceive any irregularity in their proceedings. They formed an integral branch of the late general council. Their acts are perfectly legitimate, and we can not assume the responsibility of protesting against them or of declaring them invalid.”
To the remonstrances and propositions of a national conven-of the Western Cherokees, he answered through his own national committee:
“ Council Ground, July 19,1839.
“ The national committee and council of the Eastern Cherokees having had under consideration the communication from those of the Western Cherokees, can not but express their regret at the course pursued by their Western brethren, as well as the views entertained by them on a question so important and so indispensable to the welfare of the great Cherokee family as the reunion of the two nations.
“To the assertion made in that communication that “it is believed by the national council that the two people have already been united,” we are compelled to refuse our assent.
“ That the ancient integrity of the Eastern Nation should be dissolved, and her existence annihilated, without discussion, without conditions, and without action of any kind, is utterly *32 inconceivable; and tbe rejection by tbe representatives of our Western brethren of tbe reasonable proposition to unite tbe two nations on tbe basis of tbe strictest rule of justice and equality is an act equally unlooked-for and surprising: Therefore,
“Resolved, That tbe declarations of tbe general council of tbe nation at Aquobee Camp, on tbe first day of August, 1838, in reference to tbe attributes of sovereignty derived from our fathers, be, and they are hereby, reasserted and confirmed.
“ Resolved, That tbe proceedings of tbe committee and council be forthwith laid before tbe people, that their sense maybe bad upon tbe subject.”
In 1840 Gen. Arbuckle, with tbe commendable patience and good sense that mark all of bis intercourse with tbe conflicting parties, endeavored to bring them together in two conventions to agree upon a form of government and compose their differences. Tbe scene which in 1835 bad been acted by tbe treaty party east of tbe Mississippi was reacted here, a few of tbe Western Cherokees, partly by persuasion and partly by intimidation, bolding a nominal convention, adopting an act of union, and issuing tbe following declaration:
u Whereas a meeting of tbe Cherokee people was agreed on and requested by tbe United States agent and tbe assistant principal chief and others, on tbe 15th instant, at this place, and general notification given throughout tbe country to all parties whatever, requesting their prompt attendance for tbe purpose of ascertaining fairly and properly tbe sense and choice of a majority of the nation in relation to tbe subject of their future government; and whereas, we tbe people of tbe Cherokee Nation, having assembled under this call, and having beard read and interpreted tbe act of union adopted by tbe Eastern and Western Cherokees, dated July, 1839, and tbe constitution framed by a convention composed of members from both parties in pursuance of tbe provisions of tbe aforesaid act, and being satisfied with tbe same, we do hereby approve, ratify, and confirm tbe said act of union and tbe constitution, and acknowledge and make known that tbe government based upon this act and this constitution is tbe legitimate government of tbe Cherokee Nation, and of our choice, and that it has both our confidence and support.
“Done at Tablequab, Cherokee Nation, tbe 16th day of January, 1840.
“ J. Vann,

“Assistant Principal Chief.

“W. Shorey Coodey,
“ President National Committee.”
*33 But during tbe same month Gen. Arbuckle reported to the Secretary of War:
“The act of union referred to in one of the accompanying decrees is certainly not entitled to credit, as there were a very small number of the old settlers present who concurred in it, and they acted without authority.”
He added:
“This change will no doubt be severely felt by the old settlers generally, who in their kindness invited the late emigrants to enjoy with them the lands they have secured for themselves, and who have in less than one year after their arrival formed a new government for the nation in which the old settlers are not represented by a single individual of their own choice.”
And on the 29th January he wrote to the Commissioner of Indian Affairs:
“A meeting was called for both parties to attend, consisting of old settlers and new emigrants, Cherokees, the object being to ascertain which party had the majority. The oid settlers did not attend, as they were doubtless well aware that they Avere in the minority. There were about 700 voters present, AA'ho were in favor of the new government; they voted in favor of the constitution and laws of the Boss party.”
In 1842 the Western Cherokees addressed a memorial to the President. “They have,” they say, “their complaints to make which can no longer be with, safety deferred, and they will endeavor in doing so to divest themselves of all unkind feelings against those from whom they'have suffered wrong, and base their appeal upon provisions made bylaw and treaty stipulations.” And they then with wonderful temperateness and accuracy set forth their chain of title to the 14,000,000 acres of which they had been deprived, and their legal and moral rights to the full and exclusive enjoyment of the same; and in 1844 “An oppressed and ruined people, stripped of the property and deprived of the protection which were repeatedly promised and guaranteed to them by the Government of the United States, appeal to the Congress of those United States for reparation.” “Penniless and in exile,” they say, “we are able to bring no influence to bear upon the Government or people of this Bepublic but the power of truth and the sympathy which wrong and oppression, when made manifest, never fail to excite. If these be not sufficient to procure your interposition in our behalf, nothing ivill be left to us and *34 our people bub oppression, dispersion, despair, and death.” And they, in effect, pray Congress for a division of the Territory; to be “repossessed of a corner of that country which is all their own;” for a new country to which to flee; for anything which will deliver them from the intolerable condition to which they have been reduced by the action of the Government through the treaty of New Echota.
But the Government rested on the platitude that in this country the majority must rule.
All of the ills deplored and foreseen by Gen. Arbuckle continued to fall upon .the Western Cherokees. The decree of outlawry against every Cherokee who signed the treaty of New Echota, though repealed, was still enforced. An armed police played the part of a miniature standing army, treating them as rebels to constituted authority, and exterminating under tire pretense of maintaining law. The Government hesitated before the growing power of Boss and the horrors of a general Indian war. The Secretary of War sent reproaches and demands, to which Gen. Arbuckle added remonstrances and warnings. The inhabitants of Arkansas saw with alarm that the Eastern Cherokees, from “a peaceable and harmless people,” as Major Davis characterized them in 1836, were becoming a military power, and armed and organized in anticipation of a border war.’ For seven years the state of the Cherokee country was not unlike that which in a few years was to be the condition of the adjacent Territory of Kansas.
And thus it came to pass, by the fatality which so often unhappily has attended our compacts with the Indian, (1) That the Western Cherokees who acquired the territory by reiterated treaties, who gave a valuable consideration for it in their Arkansas lands, who for nearly a generation kept faith with the Government, who thrice acquiesced in its policy — by removing to Arkansas, by removing from Arkansas, by receding a portion of their lands to the Creeks— Avere deposed as a political power, their leading men fugitives in Texas, hundreds of families despoiled of their homes and individual property, and all of them as a people ousted from two-thirds of their communal estate; (2) That the leaders of the treaty party, who, at the request and upon the faith of the repeated assurances of .the agents of the Government, cooperated with it in imposing on their people the treaty of *35 New Echota, bad been for tbe most part massacred, and, as a party, utterly destroyed; (3) That tbe Eastern Oberokees, wbo resisted tbe Government for sixteen years, and compelled it to resort to tbe costly remedy of an overpowering military force, were tbe rulers of tbe Oberokee country, and tbe only power wbicb tbe United States recognized as a body politic.
We bave thus reviewed these events, and largely from tbe claimants’ point of view, because tbeir counsel bave pressed upon tbe court an elaborate argument, earnestly insisting that tbe purpose of tbe statute by virtue of wbicb we take jurisdiction is, through tbe instrumentality of tbe judiciary, and so far as money can do so, to right these wrongs. We bave not overlooked tbe fact that tbe provisions relied upon are as broad as language can make them, and that tbe statute exceeds in tbe measure of its liberality any wbicb was ever enacted for tbe judicial redress of citizens of tbe United States. Its grant of judicial power is:
“ That tbe claim of that part of the Oberokee Indians known as tbe Old Settlers or Western Oberokees is referred to tbe Court of Claims for adjudication, and jurisdiction is hereby conferred on said coart to try said cause, and to determine what sum or sums of money, if any, are justly due from tbe United States to said Indians, arising from or growing out of treaty stipulations and acts of Congress relating thereto, it being the intention of this act to allow the said Court of Claims unrestricted latitude in adjusting and determining tbe said claim, so that tbe rights, legal and equitable, both of tbe United States and of said Indians, may be fully considered and determined, and to try and determine all questions that may arise in such cause ou behalf of either party thereto, and render final judgment thereon.” (Act 25th February, 1889, 25 Stat. L., p, 694.)
But we are, nevertheless, of tbe opinion that tbe court can not go behind tbe treaty 1846. Tbe counsel for tbe claimant bave urged in forcible 'arguments that tbe treaty 1846 was procured by duress and fraud; that these claimants for forty years bad been petitioning for tbe redress of these grievances; and that Congress intended that tbe court should view tbe United States and tbe Western Oberokees onlyintbe character of contracting parties, and tbe treaties between them as at most nothing more than contracts. Congress, it also must be borne in mind, can confer upon this court powers not strictly judicial; as in tbe Congressional cases, where tbe *36 court sits merely as a jury to ñud tlie facts for legislative consideration ; as in the Departmental cases, where it may advise an Executive Department as to its powers and duties; as in the French spoliation cases, where its functions are those of a quasi international tribunal, to pass upon the obligations and responsibilities of a foreign power.
And if the enactments before quoted stood alone, it is possible that we might reach the conclusion that Congress intended here to invest the court with extra-judicial power. But the jurisdiction of the Supreme Court, defined by the Constitution, is strictly judicial, and statutory authority can neither take away from nor add to the inherent powers of that tribunal. (Gordon’s Case, 2 Wall. R., 561; 7 C. Cls. R., 1; 117 U. S. R., 697; Klein’s Case, 13 Wall., 128.) The statute which confers this jurisdiction likewise provides that whatever judgment may be rendered, whether for the claimants or the defendants, may be appealed to the Supreme Court.
In the Supreme Court the treaty 1846 will remain a part of the supreme law of the land, which no court in this country as a court of either law or equity can declare to have been procured by duress or fraud and treat as inoperative. The questions, therefore, to be determined in this court are necessarily questions which may be reviewed in the Superme Court, and the “unrestricted latitude” conferred by the statute “in adjusting and determining the said claim” must be deemed the unrestricted latitude of a court of equity in stating an account, distributing a fund, and framing a decree so comprehensive and flexible as to secure to each suitor his joint or individual rights.
The questions, therefore, now to be considered must be confined to the legal and equitable rights of the claimants under the treaty 1846.
That treaty was a compact between three parties, the United States, the Eastern, and the Western Oherokees. Its purpose vas to make the Eastern and Western Oherokees parties to the treaty of New Echota, which they had never conceded themselves to be, and to secure peace in the Cherokee country. The principle upon which it sought to accomplish this purpose was, that on the one hand the Western Oherokees shohld £>ar-ticipate in the purchase money which had been paid for the lands east of the Mississippi; and on the other, that they *37 should abandon their autonomy and become subject to the government which had been established by the Eastern Cherokees.
The reason behind the principle was that in 1835 the Western Cherokees owned the Cherokee country west and had paid for it, and that the Eastern Cherokees acquired by the terms of the treaty of New Echota two-thirds of this without paying for it, and at the same time retained all of the purchase money which had been given for their possessions east of the Mississippi. A portion of this purchase money had been expended for the use of the Eastern Cherokees and a portion continued to be held as a trust for their benefit,- the remainder had been paid to them per capita.
If their removal had been effected on the same terms as that of the Western'Ohérokees under the treaty of 1828 they would have received land in the Indian Territory in exchange for land east of the Mississippi.
As it was, they had received both land and money; but the land was the land of the Western Cherokees. Strictly the Government should have paid the Western Cherokees for the lands thus appropriated, and should have deducted the price from the money paid to the Eastern Cherokees. It was now sought by the treaty of 1846 to accomplish this in an indirect way; the Western Cherokees were to be admitted ab initio to a quasi partnership or joint ownership, by the terms of which they were to contribute the land in the Indian Territory and share in the proceeds of the land east of the Mississippi.
By the terms of this arrangement the Eastern Cherokees consented to their sharing in the purchase money so far as it was still held by the United States in the form of trusts and annuities; and the United States agreed that so far as it had been I) aid away to individual Indians and could not be restored they should pay it over again, and thus make good to the Western Cherokees their rightful proportion of the fund; but the nominal amount of the purchase money was not to be taken as the true amount; certain deductions were to be made, and those deductions constitute the real issues in this case.
It is proper to say here that this was not the form in which the treaty stated the nature of the transaction. It recites the position maintained by the United States, that the Western Cherokees “ had no exclusive title ” to the territory west of the *38 Mississippi, “which became the common property of the ichole Oherolcee Nation by the operation of the treaty of 1828;” that, however, the Cherokees then west of the Mississippi, “ by the equitable operation of the same treaty, acquired a common interest in the lands occupied by the Oherohees east of the Mississippi, which interest should have been provided for in the treaty of 1835, but which loas notand that they, the Western Cherokees, retain “a common interest in the general funds of the nation,” and “ have an equitable claim upon the United States for the value of that interest, whatever it may be.”
The treaty then provides for the ascertainment of “the value of that interest” which the United States agree to pay; and the Western Cherokees, in consideration thereof, “release and quitclaim to the United States all right, title, interest, or claim they may have to the Cherokee lands east of the Mississippi Eiver and to exclusive ownership in the lands ceded to them by the treaty of 1828,” and agree that those lands “shall be and remain the common property of the whole Cherokee people, themselves included.”
But as the Western Cherokees had again and again disclaimed an interest or property in the lands east of the Mississippi, and the Eastern Cherokees had unceasingly denied any obligation under the treaty of New Echota, this was only a diplomatic way of retaining in the new treaty the views of both parties, the Government nominally paying for a “quitclaim ” to the lands east of the Mississippi, but the true and practical result of the transaction being that the Western Cherokees surrendered their right to a separate sovereignty and sold an undivided two-thirds of their own lands in tbe Indian Territory in consideration of one-third of the price which had been paid for the lands of the Eastern Cherokees.
The treaty, 1846, then declares the “principle” upon which the value of the interests derived from the property east of the Mississippi shall be ascertained. The “sums” granted in the treaties 1835 and 1836, amounting to $5,600,000, are to be taken as the basis or starting point of computation, and “ all the investments and expenditures which are properly chargeable upon the sums granted in the treaty of 1835, amounting in the whole to $5,600,000 (which investments and expenditures are particularly enumerated in the fifteenth article of the treaty of 1835), to be first deducted from said aggregate sum.” Upon *39 this language of the treaty it is maintained by the counsel for the claimants that the only deductions to be made from the treaty fund of 1835 are such as may be “ properly chargeable ” to the Western Cherokees; and by the counsel for the defendants that the deductions to be made are “the investments and expenditures particularly enumerated in the fifteenth article of the treaty of 1835;” and thus the controversy turns upon a single word, the word “ properly.”
This fifteenth article is a part of the treaty 1835 and of the compact between the United States and the Eastern Cherokees. It was not framed to express the compact and agreement between the United States and the Western Cherokees, and is not to be found in the treaty 1846, except by reference. As between the United States and the Eastern Cherokees, the rules for the construction of statutes and treaties would require that it should be deemed expressive of the intent of the parties and that full effect should be given to each of its provisions. As between the United States and the Western Cherokees, it is equally manifest that it should be applied only so far as it was properly applicable to the compact into which they were entering.
The only reference which that compact makes to the fifteenth article of the preceding treaty is placed in a parenthesis. It is a rule of grammar that words in a parenthesis do not affeet modify, or change the construction of a sentence.
But apart ficom grammar, the purpose of the treaty 1846 was that all expenditures made under the treaty 1835, “properly chargeable ” to the partnership within the intent and purpose of the new compact, should be charged against the partnership fund, whether found in the fifteenth article or not, and the parenthesis referring to the fifteenth article is little more than a footnote, telling where the “investments and- expenditures” are enumerated and may be found.
A more literal construction may, indeed, operate to the disadvantage of the United States. This fifteenth article is in these words:
“Article 15. It is expressly understood and agreed between the parties to this treaty, that after deducting the amount which shall be actually expended for the payment for improvements, ferries, claims for spoliations, removal, subsistence, and debts and claims on the Cherokee Nation, and for the additional quantities of lands. and goods for the poorer class of *40 Oherokees, and the several sums to be invested for the general national funds provided for in the several articles of this treaty, the balance, whatever the same may be, shall be equally divided between all the people belonging to the Cherokee Nation east, according to the census just completed; and such Oherokees as have removed west since June, 1838, who are entitled, by the terms of their enrollment and removal, to all the benefits resulting from the final treaty between the United States and the Oherokees east, they shall also be paid for their improvements according to their approved value before their removal, where fraud has not already been shown in their valuation.” (7 Stat. L., p. 478.)
Among the “ expenditures” so enumerated which are to be made is one “for the additional quantity of lands and goods for the poorer class of Oherokees.” The twelfth article of the treaty fixed the amount at $100,000. But the expenditure so authorized was never made; and assuredly a party can not be charged with money as an expenditure where it was not expended.
The amount specified in the treaty for the general fund of the nation was $400,000 (Art. 10); yet the court, as will hereafter appear, has charged the treaty fund with $500,000. The reason for so doing is that by a subsequent arrangement between the United States and the Eastern Oherokees (Art. 4, treaty 1836) the $100,000 for the poorer classes was diverted from that object and placed in the general fund. If the language of the treaty of 1846 should not be interpreted according to the intent and purpose of the compact, the Western Oherokees would escape from the charge of $100,000 for the poorer class, because the expenditure was not made, and from the full charge of $500,000 for the general fund, because the tenth article referred to specifies only $400,000 as applicable to that purpose. But the court has made a charge of tins $100,000 — not because it is ¿numerated in the fifteenth article, but because it has become an investment for the benefit of the partnership, and is therefore “properly chargeable” to the treaty fund.
The $5,600,000 or treaty fund represents the purchase money paid to the Eastern Oherokees for lands and property east of the Mississippi, but it represents something more than the communal property in which the Western Oherokees acquired by the treaty of 1846 a retroactive interest. It represents *41 botb communal and private property, and to ascertain tire amount paid for tbe former we must deduct tbe amounts allowed for tbe latter. Tbe. fifteenth article provided for this; and so deducting, we bave:
Amount of the treaty fund. $5,600,000.00
Less amounts paid to individuals:
For improvements. $1,540,572.27
For ferries. 159,572.12
For spoliations. 264,894.09
- 1,965,038.48
Giving as the price of the communal property. 3,634,961.52
But while tbis amount of $3,634,961.52 represents tbe purchase money of tbe communal property, it does not represent tbe fund which was to be paid to tbe Eastern Cherokees per capita in cash. A part of tbe consideration nominally in money was really in land. Tbe United States bad added to tbe territory 800,000 acres, and tbis land was to be credited as a payment of $500,000. Tbe Western Cherokees bave shared in tbe advantages of that increase of territory, and tbe item is “properly chargeable” against them under tbe treaty of 1846. Five hundred thousand dollars was also, by tbe terms of tbe fifteenth article, and tbe supplemental article 4 of 1836, to be deducted and held by tbe Government in trust as a general fund for tbe Cherokee people. In tbis trust fund tbe Western Cherokees also bave participated, and tbe deductiofi is likewise “properly chargeable” against them; so that we bave:
The purchase money of the communal property. $3,634,961.52
Less 800,000 acres of land. $500,000
General trust fund. 500,000
-;- 1,000,000.00
Reduced to a fund of. 2,634,961.52
But this fund of $2,634,961.52 was in equity and by tbe terms of tbe fifteenth article subject to certain charges; and tbe only doubtful questions of controversy in tbis case are as to those which are “properly chargeable ” within tbe intent of tbe treaty, 1846, to tbe Western Cherokees.
Tbe fifteenth article provided for tbe payment of “ debts and claims upon tbe Cherokee Uation,” and under that bead there has been charged to tbe treaty fund $22,212.76 for tbe expenses of tbe Cherokee committee.
*42 The court understands this item to be for the expenses and services of the committee authorized by the twelfth article of the treaty, 1835. In other words, it is a charge for services necessary for carrying the treaty into operation, and it is in its nature like a charge for legal services in procuring the settlement of an estate. Such a charge upon a fund in equity would be allowed ordinarily by a court of equity; and it is the opinion of the court that it, $22,212.76, is “ properly chargeable ” to the fund in this case.
There has also been charged to the fund $18,062.06 for the payment of the national debt of the Eastern Gherokees. What this national debt was does not specifically appear, but it was probably for printing their statutes and public documents, and for the salary of their few officers. It was a debt which the Eastern Cherokees were bound to pay, the debt of one partner, and in the absence of evidence to connect it with the fund for distribution we must hold that it was a debt which should have been paid by taxation, and was not “properly chargeable” to the treaty fund.
Another item so charged is $61,073.49, “ debts due to United States citizens.” Like the preceding item, there is nothing to connect it with the fund in question, and, upon the same principle, it must be disallowed.
The last and chief item which is a subject of contention is the charge or charges for the removal and subsistence of the Eastern Gherokees.
The fourth article of the treaty 1846, after declaring that “the investments and expenditures which are properly chargeable” shall be deducted from the treaty fund, and after reiterating that “all improper and extravagant expenditures” shall be excluded, sets forth this provision:
“It is further agreed that so far as the Western Gherokees are concerned, in estimating the expense of removal and subsistence of an Eastern Oherokee to be charged to the aggregate fund of $5,600,000, above mentioned, the sums for removal and subsistence stipulated in the 8th article of the treaty of 1835, as commutation money, in those cases in which the parties entitled to it removed themselves, shall be adopted.” (Art. 4, treaty 1846.)
And upon this provision of the treaty it is contended by the claimants, 1st, that the cost of subsisting an Eastern Cherokee after his removal was not a proper charge against the Western *43 Oherokees ; and 2d, that of the 2,495 persons who emigrated voluntarily prior to 1838, 295 were not Oherokees, but slaves of African descent, and for neither their removal nor subsistence are the Western Oherokees properly chargeable. It is conceded that a charge of $20 per head for the removal of 2,200 Oherokees, amounting to $44,000, is properly chargeable against the fond.
We have so far, for convenience and simplicity, followed the phraseology of the treaty 1846 in speaking of the treaty fund as $5,600,000 and in ascribing it to the treaty 1835; but the fact is that the treaty 1835 named only $5,000,000 as the purchase money of the property east of the Mississippi, and that the additional $600,000 was brought into the transaction and made a part of the treaty fund by the supplemental treaty 1836. The thing which led to this supplemental treaty was that after the preceding treaty had been signed, but before any of the Eastern Oherokees had been removed, a question had arisen whether the cost of removal was to be borne by themselves and taken out of the treaty fund, or whether it was to be borne by the United States.
To bring the question before the Senate and to remove this remaining difficulty, as it was supposed, in the way of the removal, the President entered into the supplemental treaty which was afterwards duly ratified. It recites the facts of the disagreement, the belief of the Oherokees that the Senate had understood the treaty as they themselves had understood it, and it provides an additional amount of $600,000 u allowed to the Cherokee people to include the expense of their removal.” The treaty 1846 regarded the two treaties as one instrument, and brought together the amount named in both as one treaty fund, but at the same time made this augmented fund subject to an expenditure which was not a part of the consideration given for the lands east of the Mississippi, but which was the primary and immediate object of the addition of $600,000.
The language of the fourth article of the treaty 1846 so far as it relates to the removal and subsistence of the Eastern Oherokees, is that:
“In estimating the expenses of removal and subsistence of an Eastern Cherokee, to be charged to the aggregate fund of' $5,600,000, above mentioned, the sums for removal and subsist *44 ence stipulated in the 8th. article of the treaty of 1835, as commutation money in those cases in which the parties entitled to it removed themselves, shall be adopted.” (Article 4, treaty 1846.
If this language stood alone, or if this article 4 constituted the whole of the treaty of 1846, there could not be a reasonable doubt that subsistence and removal were both to be charges upon “the aggregate fund of $5,600,000,” and that the one was as clearly intended as the other. But article 11 of the treaty placed a reservation upon this provision, and expressly suspended the question of its limit and intent. It is as follows:
“Article 11. Whereas the Cherokee delegations contend that the amount expended for the one year’s subsistence, after their arrival in the west of the Eastern Oherokees, is not properly chargeable to the treaty fund, it is hereby agreed that that question shall be submitted to the Senate of the United States for its decision, which shall decide whether the subsistence shall be borne by the United States or the Cherokee funds, and if by the Oherokees, then to say whether the subsistence shall be charged at a greater rate than thirty-three dollars per head; and also the question whether the Cherokee Nation shall be allowed interest on whatever sum may be found to be due the nation, and from what date and at what rate per annum.” (9 Stat. L., pp. 871, 875.)
Pursuant to the authority conferred by the preceding article of the treaty, the Senate considered the subject and gave its decision in the form of the following resolve:
“Resolved ~by the Senate of the United States, That the Cherokee Nation of Indians are entitled to the sum of one hundred and eighty-nine thousand four hundred and twenty-two dollars and seventy-six cents for subsistence, being the difference between the amount allowed by the act of June 12th, 1838, and the amount actually paid and expended by the United States, and which excess was improperly charged to the 1 treaty fund'1 in the report of the accounting officer of the Treasury.”
The reason why the resolution took this form is explained by the facts with which the Senate had to deal, viz:
Immediately before and up to the time of the eviction of the Oherokees, the Government had been carrying on a negotiation with their delegates who had submitted certain propositions looking toward a new treaty. On the 18th May, 1839, ■Mr. Poinsett, Secretary of War, communicated his rejection of them to the delegates, but at the same time made to them an *45 offer, tbe substance of wbicb was tbat if tbe Cberokees would “ remove peaceably and contentedly to tbeir new bornes in tbe West” tbe United States would defray tbe expenses of tbeir removal and subsistence. Tbis offer bears date only five days before tbe eviction began. It was not accepted by tbe Cberokees, but seems to bave been tacitly acquiesced in, they removing peaceably if not contentedly and subsequently claiming tbat tbe cost of removal and subsistence should not be borne by themselves. On tbe part of tbe United States tbe offer of tbe Secretary of War seems to bave been treated as a promise. Tbe Senate therefore ascertained tbe amount wbicb bad been deducted from tbe per capita payments to tbe Eastern Cberokees for subsistence, and embodied it as an award in tbeir decision.
It was then settled in tbe precise manner prescribed by tbe treaty, tbat tbe charge for tbe subsistence of tbe Eastern Cberokees was not properly chargeable to tbe treaty fund; and tbe deduction must be confined to tbe item for removal. If any further authority were needed besides tbe decision of tbe umpire, it would be found in tbe fact tbat Congress immediately accepted the decision and appropriated money to make good tbe award (Act 30th September, 1850, 9 Stat. L., p. 554-556). It must accordingly be held tbat tbis expenditure is not to be deducted from tbe treaty fund.
Tbe charge for tbe removal of 295 slaves belonging to tbe Eastern Cberokees must likewise be disallowed. As between tbe Eastern Cberokees and tbe United States tbe charge would undoubtedly be a proper one. If they bad chosen to take all of tbe poor whites of Georgia with them as members of tbeir families or adopted members of tbeir community, tbe cost being borne by themselves and paid out of tbe $600,000 fund, would bave been no concern of tbe United States so long as tbe number of persons did not exhaust tbe fund.
It is not a question of slavery or slave property. Whether these servants of tbe Eastern Cberokees were black or white, bond or free, tbe cost of tbeir removal would fall upon tbeir masters. Tbe more persons they chose to take with them tbe less money there would be to be divided per capita,. But tbis reasoning does not apply to tbe Western Cberokees. They agreed to pay tbeir proportion of tbe cost of “removing” “ Cberokees,” and they did not agree to pay for the removal of any other *46 persons who properly or improperly bad been removed, either at the cost of the United States or the cost of the Eastern Cherokees. Other persons were actually removed ; but the treaty of 1846 says: “ 80 far as the Western Cherokees are concerned, in estimating the expense of removal of an Eastern Cher-olcee to he charged to the fund,” the liability shall be limited to the commutation amount of $20. ■ The treaty therefore restricts the cost to $20 and the persons to Cherokees; and the term “ an Eastern Cherokee” can no more be extended to all the persons actually removed than the amount, $20, can be magnified into the actual cost of removal.
But the cóunsel for the United States contends that this provision of the treaty of 1846 is not restricted to those Cherokees who voluntarily emigrated, and on the contrary that it was intended to include all of the Eastern Cherokees.
It appeared by a communication from the Secretary of War to Congress, May 25, 1838, before the great removal of the Cherokees was effected in 1838, that the appropriation of $600,000 made in pursuance of the supplemental treaty of 1836, had been in part diverted to other purposes than that of removal, and was in fact nearly exhausted. It appeared also that if the Cherokee people were then to be removed, an appropriation must be made for that purpose. The Secretary also estimated that the actual cost of removal would be $475,200, and their subsistence for one year $611,105.
The situation did not admit of further negotiation, and Congress accordingly made the necessary appropriation, with a direction that it should not be charged to the $5,000,000 of the treaty of 1835. (Act 12th June 1838, 5 Stat. L., p. 241.) As between the United States and the Eastern Cherokees, if would have been proper for Congress to have charged the whole cost of removal to the treaty fund and deducted it from the per capita payments. But as between the United States and the Western Cherokees, it was no concern of theirs, as we have previously said, whether persons were removed who were not Cherokees and whether the actual cost exceeded the commutation rate; and it was likewise no concern of theirs whether the United States voluntarily bore a portion of the cost of removal or charged it all to the Eastern Cherokees.
The $600,000 of the supplemental treaty was “allowed to the Cherokee people to include the expense of their removal;” the *47 treaty 1846 brought it into the treaty fund for the benefit of the Western Cherokees, limiting the cost but not the numbers, and no clause of the treaty or reservation of the contracting parties indicates that it was not subject to the cost of removing all of the Cherokees who voluntarily or involuntarily moved or were removed under the treaty 1835. The court is therefore of the opinion that the charge for the removal of 16,957 Eastern Cherokees, at $20 each, amounting to $339,140, is properly chargeable against the fund.
The account of the Western Cherokees, as stated and allowed by the court, will therefore stand as follows:
The treaty fund. $5,600,000.00
Less for 800,000 acres of land. $500,000.00
For investment in the general fund. 500, 000.. 00
For improvements of individual Cherokees ... 1,540,572.27
For ferries belonging to individuals... 159,572.12
For spoliations of individual property. 264,894.09
For expenses of Cherokee committee.■- 22,212.76
For removal of 16,957 Cherokees. 389,140.00
- 3,326,391.24
Giving as the true residuum to he divided. 2,273,608.76
Due to the Western Cherokees, one-third of residuum. 757,869.58
Less payment September 22, 1851, under the act September 30, 1850 . 532,896.90
Leaving as the balance due the Western Cherokees.. 224,972.68
And this brings us to the largest and most important sub-divsioii of the suit, the claim for interest.
The Amended Court of Claims Act 1863 (12 Stat. L., p. 765, § 7), which first established the judicial liability of the United States by authorizing a judicial tribunal to render final judgments against the Government, drew at the outset the distinction between interest as damages and interest as an agreed compensation for the user of money. That provision, embodied in the Revised Statutes, § 1091, still continues to govern all cases of ordinary jurisdiction.
This court, however, at an early day decided that where the relief under a special act was limited to a fund derived from Mexico for the satisfaction of international claims the suit must be regarded as against Mexico, and that the court was not prohibited from awarding interest. (Atocha's Case, 8 C. Cls. R., *48 427.) Tbe Supreme Court in McKee’s Case (91 U. S. R., 442) carried tbe principle still further andbeld that where Congress have generally allowed interest upon a certain class of claims, and refer one of the class with instructions to adjust and settle the same according to “ the rules and regulations heretofore adopted by the United States in the settlement of like cases,” this court should award interest.
In 1846 the commissioners of the United States and of the Western Oherokees had agreed upon the terms of a treaty with the exception of two matters of difference, which it was determined should be submitted to an umpire, the Senate of the United States. These subjects of disagreement, as before stated in this opinion, were the charge for subsistence and interest. That the Senate can act as umpire under such a treaty, and that its award will constitute a valid and obligatory indebtedness on the part of the United States, was settled by the decision of the Supreme Court in the Choctaw Case (119 U. S. R., 1.)
The fourth article of the treaty 1846 declares that the Western Oherokees then had “an equitable claim upon the United States” for the value of their interest in the lands east of the Mississippi which had been sold to the United States, and that “the value of that interest” should be ascertained by a method then prescribed, and that when ascertained the price should “be distributed per capita to each individual” of the Western Oherokees, in consideration of which the Western Oherokees “hereby release and quitclaim to the United States all right, title, interest, or claim they may have to a common property in the Cherokee lands east of the Mississippi River, and to exclusive ownership to the lands ceded to them by the treaty of 1833 west of the Mississippi.” But this article, which fixes the price of the purchase and the terms of the sale, is silent on the subject of interest.
The eleventh article then comes into the agreement and modifies the fourth. It declares that “the question whether the Cherokee Nation shall be allowed interest on whatever sum may be found to be due the nation, and from what date and at what rate per annum,” “ shall be submitted to the Senate of the United States.” The Senate acted under this authority of the eleventh article, and made its award in the form of the following resolve:
*49 “ Besolvecl, That it is tbe sense of tbe Senate that interest at tbe rate of five per cent per annum should be allowed upon tbe sums found due tbe Eastern and Western Oherokees, respectively, from tbe twelfth day of June, eighteen hundred and thirty-eight, until paid.” (Appendix Cong. Gl., 1st sess., 31st Cong., Vol. 22, Part II, pp. 1334, 1340.)
Immediately after this decision of the Senate, and in conformity thereto, Congress passed the Act 30th September, 1850 (9 Stat. L., p. 556), appropriating for distribution among the Western Oherokees $887,480.15, of which $532,896.90 was for money due to them under the treaty 1846 and $354,583.25 was for interest thereon.
We have, then, this demand for interest, not arising after the execution of the instrument and the performance of the contract, but existing before the treaty was signed, and forming a subject of difference ab initio while the negotiations were carried on; we have this subject of difference provided for in the treaty itself and determined in the manner provided; we have the determination accepted as valid and binding by the party against whom it was made, and carried into effect by the payment of the money; finally we have the jurisdictional act directing the court “to try and determine all questions that may arise in such cause on behalf of either party thereto and render final judgment thereon,” and declaring it to be “ the intention of this act to allow the said Court of Claims unrestricted latitude in adjusting and determining the said claim.”
The court is therefore constrained to decide that by the force of the treaty which made the compact between theparties, and of the statute by virtue of which the controversy with all matters of difference between the parties is now being brought to a final determination, the Western Oherokees should recover interest at the rate of 5 per cent upon the unpaid balance of the treaty fund ($224,972.68) from the 12th day of June, 1838, to the day of the rendering of this decision, being for fifty-three years, five months, and eighteen days, and amounting to $601,426.70.
There still remain two subjects of difference which have been presented by the claimants, the first of which is based on the following resolve, adopted November 16,1846, that is, soon after the treaty 1846 had been proclaimed.
*50 “Resolved by the Cowncil of Western OheroTcees in general council convened, That inasmuch as many of our people were compelled to leave their homes and go into the States for safety, thereby suffering many damages and losses, that the old settlers or western Cherokees petition the United States Government to appropriate from the Treasury of the United States the sum of $30,000 to pay off such losses and damages.”
Of this grievance it is sufficient to say that it is for individual property, the compensation of which would not go into the general fund or be subject to distribution per capita, and that there are no such individual claimants alleging and proving ownership before the court.
The last subject of litigation is for the proceeds of 3,343 acres of land in Arkansas, on which was the agency of the Government when the Western Cherokees dwelt in the State, and it is founded on the following provisions of the treaties of 1828, 1833:
“Article 4 (treaty 1828). It is further agreed that the property and improvements connected with the agency shall be sold under the direction of the agent and the proceeds of the same applied to aid in the erection, in the country to which the Cherokees are going, of a grist and saw mill for their use.’7 (7 Stat. L., p. 311.)
“Article 4 (treaty 1833). * * * And said United States will cause to be erected on said lands, for the benefit of said Cherokees, eight patent railway corn mills, in lieu of the mills to be erected according to the stipulation of the IV article of said treaty of Cth of May, 1828, from the avails of the sale of the old agency.” (7 Stat. L., p. 414.)
Neither the one nor the other of these obligations was discharged by the United States. The lands were sold or given away and the proceeds have never been accounted for. • In the absence of more positive evidence of their value when the Government thus appropriated these lands, the court can not do more than adopt the minimum price at which the public lands were sold,> $1.25 an acre, and allow to the claimants $4,179.26 for this item of their suit.
The final account, therefore, between the parties of all subjects of difference “arising from or growing out of treaty stipulations and acts of Congress,” adjusted and determined by this suit, “so that,” in the words of the statute, “the rights, legal and equitable, both of the United States and of said *51 Indians,” are now fully determined and forever at rest, will be stated as follows:
Balance remaining due to Western Cherokees of their just and proper proportion, being one-third of the true residuum of the treaty fund. $224,972.68
Interest thereon from 12th June, 1838, to 30th November, 1891 601,426.70 Proceeds of 3,343^ acres of land in Arkansas.. 4,179.26
Amounting in the aggregate to. 830,578.64
For wbicb amount tbe Western Cberokees are entitled to a decree.
But wbo are tbe Western Cberokees witbin tbe intent of tbe act, and in wbat character do tbe claimants come into tbis court?
There are three classes of suitors wbo may maintain actions. Tbe first are sovereignties. It is not essential that tbe sovereignty be absolute nor that tbe right be asserted in tbe name of tbe sovereign. Tbe States of our Union are illustrations of limited sovereignty and tbe action may be maintained in tbe person of an officer. Neither does tbe right depend upon formal constitutions or expressed powers. Tbe right to take and bold property is an attribute of sovereignty.
Tbe second class are corporations, wbicb may be public or private and organized under general or special laws, but wbicb are in all eases creatures of tbe law and emanations of sovereignty.
Tbe third class are individuals or aggregations of individuals, such as joint-stock companies, partnerships, and persons suing in a representative capacity as executors and trustees.
As to tbe first class, tbe claimants are not, and do not assume to be, a body politic. They are seeking individual redress from, tbe United States, through tbe medium of tbis suit as they might have sought it through tbe intervention of tbe Western Cherokee government if it bad continued to exist. As to tbe second class, no legislative charter or act of incorporation exists either from tbe United States or from tbe Cherokee Nation, and tbe claimants do not allege a corporate existence. As to tbe third class, tlfey are not a partnership or joint-stock company, but simply individuals or an aggregation of individuals having joint or several demands.
Nevertheless, as concerns tbis action three things must be *52 observed: 1st, that the claimants have set up iu their petition no ease of individual loss or injury; 2d, that the lands of which the Western Oherokees were deprived were not public in the sense in which our public lands are held and sold as the property of the Government, nor private in the sense in which our citizens own and possess realty, but were communal; 3d, that the treaty fund given as indemnity for the lands of which they were deprived, and which form the subject-matter of the present suit, belongs to the Western Oherokees, if at all, as individual members of an Indian community.
Who, then, are the joint or several owners in whose favor the judgment is to be entered?
Their names are not set forth in the petition, nor the extent of their respective rights and interests alleged. And from the nature of things this could not have been done. The suit purports to be by the “Western Cherokee Indians,” and to be brought by three persons “ for themselves as the commissioners” of the Western Oherokees, one of the three being also styled “ treasurer,” etc. The petition alleges that the claimants “ are that part of the Cherokee race of Indians which formerly composed the Western Cherokee Nation, and that for the purpose of prosecuting their claim against the United States Government they have appointed Joel M. Bryan, William Wilson, and William H. Hendricks as their commissioners, to represent them and in their names and for their benefit to do and perform any and all acts and things necessary and proper to be done by them in the premises.”
' The claimants, in their request for findings, allege nothing more than that they, the claimants, “are the remaining part of those Cherokee Indians who formed and composed the Western Cherokee Nation; and that they have maintained their separate organization so far as to adjust and settle their claims against the United States.” The evidence to sustain the request consists of the minutes of public meetings, sometimes styled “conventions” and sometimes “annual councils,” the first of which was held in 1874. At one of their councils the persons styled commissioners were appointed, but who were the persons that composed the council does not appear.
Waiving the facts that a public meeting can not effect a transfer of private property, and that the appointment of the *53 commissioners as attorneys in fact would not bind persons who were not present at the council, or those who may have dissented from the proceedings, and that the authority given is merely to prosecute and does not constitute the commissioners trustees to receive and disburse the money, it is sufficient to say that several hundred thousand dollars can not be taken out of the Treasury under no better authority than a public meeting of unknown persons.
The lands east of the Mississippi were not vested in the Cherokee government, as distinguished from the Cherokee people. Their chiefs in council as representative of the body politic might, perhaps, have sold or disposed of them, but under their constitution and laws could not have brought an action of trespass or ejectment against one of their own citizens for dwelling upon or hunting over the lands. The title was not vested in the Oherokees as individuals. They were not tenants in common nor joint tenants. The individual Cherokee had no vested right which he could convey or devise or make the subject of a suit in partition. If he withdrew from the community, he left all rights behind him; and if a stranger was admitted, he acquired a right by virtue of his admission alone. The property was communal — a property wherein every person, not as an individual, but as a member of the community— held an equal indistinguishable, indivisible right of user, and nothing more.
By the treaty of 1835 the Eastern Oherokees determined to bring the communal character of the property to an end, and by the treaty of 1846 the Western Oherokees assented to the arrangement. The fund took the place of the realty; a part of it became governmental, i. e., continued in trust for the benefit of the nation; apart was invested in new lands; a part was devoted to the removal of the people to the Indian Territory, and the remainder was divided in severalty, i. e., distributed among the community per ccvpita.
Accordingly, when the United States brought the Western Oherokees into the arrangement, they came as a community then existing, in 1846, and by the arrangement were to receive in severalty their individual shares of the communal property. The community then ceased to be. Its component units, the individual Western Oherokees, were ascertained and paid; *54 but tbeir right to payment was grounded on tbe fact that tbe Western Cherokee government was dissolved, and that they bad become simply citizens of tbe Cherokee Nation.
Tbe persons who were thus ascertained and paid under tbe treaty of 1846 as Western Cherokees, are tbe only persons known to tbe United States by that designation, and are tbe claimants in this suit. Tbe jurisdictional act was passed to correct whatever wrongs might have been done to those persons, and tbe suit has been brought to enlarge tbe residuum, of which they received a third, and to augment tbe amount which each individual was paid. The persons who suffered losses and injuries, and an infringement of their communal rights by the intrusion of the Eastern Cherokees, can not all be living, and it is indeed tolerably certain that the greater part of them have passed away.
But the decree which is now rendered will in legal effect relate back to the transaction of the previous accounting and payment as effectually as if it had been rendered immediately after the payment in 1851. The jurisdictional act makes no provision in case of the death of an original claimant; it does not say that themoney which may be recovered in a final judgment shall go to the survivors, nor does it say that it shall go to the heirs or next of kin. All questions of succession it impliedly remits to the laws and usages of the Cherokees.
The case then being that of many persons severally interested in a common fund, is one of which equity takes jurisdiction to prevent a multiplicity of litigation, and the suit belongs to the first class defined by Story (Eq. Pleadings, § 97), “where the question is one of a common or general interest, and one or more sue or defend for the benefit of the whole.”
In such a suit the active complainants who prosecute can not constitute themselves trustees to receive the money of those who have not appeared. The only advantage which they gain by their activity is in securing priority of payment. They are not compelled to wait for those who have not appeared.
The formal decree in such cases establishes the general liability of the party proceeded against to the parties who have prosecuted, or for whom the suit has been prosecuted, but not the particular rights of nominal parties who have not appeared. They, however, are allowed ordinarily to come in and establish their claim to a portion of the general recovery. *55 “Where,” said Lord Eldon, in Cockburn v. Thompson (16 Ves., 327), “the court for convenience dispenses with the presence of parties, the principle leads it, by future arrangement, to find out the means of giving them an opportunity in some shape of coming in.” And Chancellor Walworth, in the leading American case of Hallett v. Hallett (2 Paige 19), has likewise said:
“In these cases to remedy the practical inconvenience of making a great number of parties to the suit, and compelling those to litigate who might otherwise make no claim upon the defendants, or the fund in their hands, a method has been devised of permitting the complainants to prosecute on behalf of themselves and all others standing in the same situation, who may afterwards elect to come in and claim as parties to the suit, and bear their proportion of the expenses of the litigation. If such parties neglect to come in under the decree, after reasonable notice to them for that purpose, the fund will be distributed without reference to any unliquidated or unsettled claims which they might have had upon the same.. But if the rights of such absent parties are known and ascertained by the proceedings in the suit, provision will be made for them in the decree.”
In this case it is known to the court that there are absent parties “standing in the same situation” who participated in a certain proportion in the primary fund, and who will be entitled to participate in precisely the same proportion in the additional fund, which is the subject of recovery in this suit; and all they will have to establish when they come in will be their own identity if they are original claimants, or their right to represent deceased claimants and the identity of those they represent.
It has been suggested that when Congress provide for the payment of this judgment the Department of the Interior may be authorized in a simpler and more summary manner to ascertain and pay the claimants who have not appeared, and such a course will doubtless be acceptable to them, and will materially lessen the labors of the law officers of the Government; but in the meanwhile it is the duty of the court to protect the equities of these absent claimants, and a decree to that end will be entered, following the substance, if not the form, of a decree in like chancery proceedings.
As to the three claimants who have appeared and who it is understood are Western Cherokees and participated in thedis- *56 tribution of tbe former fund, tbe entry of tbe decree may be suspended, to enable tbein to show tbe proportionate share wbicb they received of tbe fund under the act of 1850. On such proof coming in, they will be entitled to recover in this suit a like proportionate share of tbe judgment of $830,578.64, wbicb will then be entered.
As to persons equitably entitled to share in tbe judgment, but who do not appear on tbe roll of those who received and receipted for tbe fund under tbe act of 1850, as in cases where tbe original claimants have died or where they received more than their individual proportion as heads of families or guardians, it is impossible for this court to follow tbe fund in tbe matter of distribution or to administer tbe Cherokee law of descents, but a provision will be inserted in tbe decree saving tbe rights of these parties.
After tbe above decision bad been announced, tbe claimants moved to increase tbe amount of tbe recovery and for additional findings of fact and to modify tbe form of tbe decree. Tbe following is tbe motion last referred to:
“Come now the ‘ Old Settlers,’ or Western Cherokee Indians, etc., by their duly appointed and authorized attorney of record, and move this honorable court that in tbe above-entitled cause judgment or decree be entered for the1 Old Settlers,’ or Western Cherokee Indians, as an aggregate or quasi corporate body leo MfflW.’”
The court, after advisement, announced on tbe 25th January, 1892, tbe following as tbe final decision in tbe case, and directed tbe entry of tbe decree appended to tbe opinion.
Nott, J.,
delivered tbe opinion of tbe court:
Since tbe decision in this case was announced on tbe 30th November last, tbe court, at tbe request of tbe claimants’ counsel, has reopened tbe case so far as to bear counsel and admit documentary evidence relating to tbe number of tbe Eastern Clierokees who were removed under the treaty of New Ecliota. Tbe court has also beard counsel with regard to tbe form of tbe decree.
On tbe trial of tbe case there were two estimates before tbe court of tbe number of Eastern Cherokees removed by tbe United States and tbe consequent cost of removal properly *57 chargeable to the treaty fund within the intent of the treaty 1846. The first of these was made by the accounting officers of the Treasury pursuant to the joint resolution 7th August, 1848, but the elements of this estimate are not known to the court. It was adopted by the committee, whose report brought the controverted questions of subsistence and interest before the Senate, and whose recommendations were adopted and became the decisions of the Senate when sitting as umpire under the treaty 1846. This estimate, moreover, was adopted by Congress in the Appropriation Act September 30,1850 (9 Stat. L., 536). It gave as the number of Eastern Cherokees removed and chargeable to the treaty fund 18,026.
The second estimate before the court was a statement or report made by Jesse Arnold, a clerk or accountant of the Treasury Department, bearing date December 4,1884. This statement was compiled from the official vouchers of the disbursing officers who paid for the removal of the Indians. Mr. Arnold was also called as a witness to explain his statement and to state the sources of his information and the means by which the total was reached. He says in his report that it was impossible “to arrive at the exact number” of Indians actually removed, but he shows beyond question the number for which the United States undoubtedly paid. The number thus arrived at was the number adopted by the court, 17,252.
The counsel for the claimants have now produced from the Indian Office the census of Eastern Cherokees in the States of Alabama, Tennessee, North Carolina, and Georgia, taken in 1885, shortly before the signing of the treaty of New Echota, and referred to in its fifteenth article. They have also produced the census of Cherokees who remained east of the Mississippi, taken under the Act 29th July, 1848 (9 Stat. L., p. 264, § 4).
The number thus estimated would be as follows:
Number given by census 1835 .-■ 16,542
Add those who had emigrated subsequent to June, 1833. 1,176
Total east of the Mississippi in June, 1833. 17,718
Deduct those who remained, census 1848 . 1,511
Giving as the number removed.. 16,207
Instead of 17,252, the number given by Arnold and adopted by the court.
It is also contended by the claimants’ counsel that from this *58 reduced number of 16,207 should be deducted 447 Cherokees who died by the way. The total reduction claimed is, therefore, 1,492, which, at $20 each, will give $29,840 as the increase of the principal, and this increase of principal, with more than fifty-three years7 interest added, will augment the claimants7 recovery by, in round numbers, $108,500. The magnitude of the amount thus involved has required and received the very careful attention of the court.
We are of the opinion that the number determined by the decision of the court should not be disturbed uidess its error appears by clear and satisfactory evidence, and we do not think that the evidence now produced is of that character. A census is not a record which imports absolute verity. We know, moreover, that in 1835, when this census was taken, the Cherokees were watchful, suspicious, hiding in the mountains, or, as Gen. Wood states it a year later, “Living upon the roots and sap of trees father than receive provisions from the United States.77 It therefore seems to the court most improbable that this census of 1835, which forms the basis of the demand now under consideration, could have accurately enumerated every Cherokee in Alabama, Tennessee, North Carolina, and Georgia.
As to the 447 Cherokees who died by the way on the painful emigration to the Indian Territory, it is certain that their removal, such as it was, has been paid for out of the treaty fund. The treaty 1835 was not a contract to deliver these unfortunates in the Indian Territory as if they were packages of merchandise, as to which nondelivery might be set up. If it now appeared that the United States, or the treaty fund, had saved money by their deaths, we might be at liberty to deduct the cost of their removal from the charges against the fund. But inasmuch as it appears that they were removed from their former homes and that their removal was paid for at a rate far exceeding that which is now charged to the Western Cherokees, we can not hold that the charge was extravagant or improper and that it should be excluded from the account, as was the charge for removing slaves who were not Cherokees. The court, therefore, is of the opinion that its finding of the num- ■ ber of Cherokees removed under the treaty 1835, properly chargeable to the treaty fund within the intent of the treaty 1846, should not be disturbed.
*59 After considering tbe arguments of counsel in regard to the form of the decree about to be entered, the court has reached the conclusion that its decision previously announced should be modified, and that the fifth article of the treaty 1846 (9 Stat. L., p. 871, 874) may be, and indeed should be, invoked in molding the decree to meet the equities of the case and discharge the treaty obligations of the United States for the reasons now stated.
The fourth article of that treaty provides for the ascertainment of the residuum of the treaty fund of 1835, and declares that one-third of it shall “be distributed per capita to each individual” of the Western Cherokees, but does not prescribe the means by which the money shall reach the individual recipients, nor a method by which they shall be singled out of the mass of Cherokees and definitely ascertained. The fifth article then comes into the compact, and specifically provides, (1) that “the per capita allowance to be given to the Western Cherokees” “shall be held in trust by the Government of the United States;” (2) that it shall be “paid out to each individual belonging to that party or head of family or his legal representatives,” and “be paid directly to the persons entitled to it, or to his [sic] heir or legal representatives;” (3) that “the persons entitled to it” shall be ascertained by a tribunal appointed by the President, consisting of five Western Cherokees and the agent of the United States. The words of the treaty are as follows:
“ It is mutually agreed that the per capita allowance to be given to the ‘Western Cherokees,’ or ‘Old Settlers,’ upon the principle above stated, shall be held in trust by the Government of the United States, and paid out to each individual belonging to that party or head of family or his legal representatives. And it is further agreed, that the per capita allowance to be paid as aforesaid shall not be assignable, but shall be paid directly to the persons entitled to it, or to his heir [sic] or legal representatives, by the agent of the United States, authorized to make such payments.
‘ ‘And it is further agreed that a committee of five persons shall be appointed by the President of the United States from the party of ‘ Old Settlers,’ whose duty it shall be, in conjunction with an agent of .the United States, to ascertain what persons are entitled to the per capita allowance provided for in this and the preceding article.” (Treaty August 6, 1846, Art. v; 9 Stat. L., p. 874.)
*60 The money which is now awarded by the decision of the court is a part of the same fund, and the same persons are “the persons entitled to it.” It is equally within the provisions of the treaty, and should'likewise “be held‘in trust” by the same trustee, to be distributed among the same recipients in the same way. The fifth article still remains both a part of the compact and a part of the law of the case, and the Government still remains charged with the cost, the risk, and the responsibility of distribution. It was a part of the compact that the United States should assume the trust, and the duties of the trust consequently remain an element of their obligation. The purpose of the court is to give full effect to the treaty, and full effect will be given to it (1) by correcting the errors of the accounting officers in their ascertainment of the fund intended for per capita distribution, and (2) in providing for the distribution of what may remain by the means provided by the treaty.
When those errors are corrected, it is found that a balance of the per capita fund remains undistributed. The balance will necessarily follow the fund. It can go nowhere else.
The court has no power to divert it from “the persons entitled to it,” or to release the other party to the treaty from the obligation of taking it in trust, and the responsibility of paying it to the persons who were found, in the manner prescribed by the fifth article, to be “ entitled to it.” It is true that the statute which sends the case to this court is broad enough to enable the Western Oherokees to present claims of every description— claims in favor of the former body politic, claims in favor of the aggregate communal owners, claims in which all have a several interest, claims belonging to a single Oherokee as an individual. Every species of claim of different parties in interest, national, communal, individual, can be brought before the court through the medium of a single suit. And this, indeed, has been done. The petition has presented the claims of the Western Oherokees as a nation, as the joint owners of communal property, as the several owners of a common fund, and as distinct individuals whose personal property was taken or destroyed. But the statute is strictly jurisdictional; it confers power on the court; it does not create or take away a right, or relinquish or impose an obligation; and under its unprecedentedly broad and comprehensive provisions no liability of *61 the United States to the Western Cherokees as a body politic or body corporate bas been shown.
The following decree will therefore be entered in favor of the parties whose rights have been established: '
It is ordered and adjudged that the claimants recover of the defendants the sum of $224,972.68, being a balance of the per capita fund provided by the fourth article of the treaty between the United States and the Western Cherokees, dated August 6,1846, together with interest thereon from the 12th day of June, 1838, up to and until the entry of this decree, being the sum of $603,145.58, and likewise the sum of $4,179.26 for 3,343.41 acres of land in Arkansas ceded to the United States by article 4 of the treaty of May 6,1828, amounting in the aggregate to the sum of $832,297.52.
And it is at the same "time ordered and adjudged that the said amount of $832,297.52 so recovered by the claimants be held in trust by the Government of the United States, and be paid by the proper agent of the United States to each individual of the claimants entitled to participate in the said per capita hind pursuant to and in the manner provided and required by the fifth article of the said treaty of August 6,1846.