Nott, Ch. J.,
delivered the opinion of the court:
In December, 1891, the United States and the Cherokee Nation entered into an agreement for the purchase and sale of a great tract in the Indian Territory known as the Cherokee Outlet. At the time of this negotiation the Cherokees had a grievance against the United States — a grievance which had burned in the breasts of two generations, and had never been forgiven or forgotten. That grievance was the treaty of 1835, commonly known as the treaty of New Echota' — the corrupt method bjr which it had been procured, the ruthless means by which it had been executed, and the *315 evasive way in which its obligations had been left unfulfilled. The history of this treaty and its consequences have been examined and set forth by this court, and need not be repeated here. (Western Cherokees v. United States, 27 C. Cls. R., 1.) It is enough to say that “ the treaty of New Echota was the act and deed of neither the Eastern nor Western Cherokees,” and that neither the Cherokee people nor the Cherokee government ever acknowledged it. In the words of Eoss, they said in a memorial to Congress December 15, 1837:
“ We complain of sending among us a large armed force, of the attempts made to prevent the expression of opinion among us, of the arrest and imprisonment of our persons, of the expulsion of our people from their homes; for which even the document in question furnishes no ground or cause. All these, however, sink into insignificance when compared with the one overwhelming calamity, present and prospective, of having the instrument of December, 1835, enforced upon us and our people.”
And in that remarkable petition submitted to Congress, bearing date February 22, 1838, signed by 15,665 of the Cherokee people, the whole nation reiterated, “ We do solemnly and earnestly protest against that spurious instrument.”
But while the Cherokee people always maintained that the treaty of New Echota was falsely executed in their name by a few unauthorized, unofficial persons, corruptly suborned by an agent of the United States, they nevertheless were compelled by the condition of affairs in the Cherokee country and by the overwhelming power of the United States to, in a measure, adopt it through the instrumentality of the Cherokee treaty of 1846 (9 Stat. L., p. 871), of which this court has said:
“ That treaty was a compact between three parties — the United States, the Eastern and the Western Cherokees. Its purpose was to make the Eastern and Western Cherokees parties to the treaty of New Echota, which they had never conceded themselves to be, and to secure peace in the Cherokee country. The principle upon which it sought to accomplish this purpose was, that, on the one hand, the Western Cherokees should participate in the purchase money which *316 bad been paid for the lands east of the Mississippi, and, on the other, that they should abandon their autonomy and become subject to the government which had been established by the Eastern Cherokees.
“ The reason behind the 2orinciple was that in 1835 the Western Cherokees owned the Cherokee country West, and had paid for it, and that the Eastern Cherokees acquired by the terms of the treaty of New Echota two-thirds of this without paying for it, and at the same time retained all of the purchase money which had been given for their possessions east of the Mississippi. A portion of this purchase money had been expended for the use of the Eastern Cherokees and a portion continued to be held as a trust for their benefit; the remainder had been paid to them per cafita.
“ If their removal had been effected on the same terms as that of the'Western Cherokees, under the treaty of 1828 they would have received land in the Indian Territory in exchange for land east of the Mississippi.
“As it was, they had received both land and money ; but the land was the land of the Western Cherokees. Strictly, the Government should have paid the Western Cherokees for the lands thus appropriated, and should have deducted the price from the money paid to the Eastern Cherokees. It was now sought by the treaty of 1846 to accomplish this in an indirect way; the Western Cherokees were to be admitted ab initio to a quasi partnership or joint ownership, by the terms of which they were to contribute the land in the Indian Territory and share in the proceeds of the land east of the Mississippi.
“ By the terms of this arrangement the Eastern Cherokees consented to their sharing in the purchase money so far as it Avas still held by the United States in the form of trusts and annuities; and the United States agreed that so far as it had been paid away to individual Indians and could not be restored they should pay it over again, and thus make good to the Western Cherokees their rightful proportion in the fund.” (Western Cherokees v. United States, 27 C. Cls. R., 1, 36.)
Having thus become indirectly and unwillingly parties to the treaty of New Echota the Eastern Cherokees, nevertheless — that is to say, all of those Cherokees who were divested of their lands.east of the Mississippi by the treaty of New Echota in 1835 — have steadfastly and persistently maintained that that treaty, harsh and inexorable as it was, has never been carried into effect according to the true import and ostensible intent of its provisions.
*317 In 1891 the Cherokee people and the United States were confronting each other for the last time as vendors and purchasers of land. The Cherokee Outlet was then the last remnant of territory to be ceded, and in a few years the autonomic government of the nation was foreordained to cease. The Cherokee commissioners were true to their people and their fathers in demanding as a condition to the cession and as an addition to the specified consideration for the grant ($8,300,000) that all of the past treaty transactions between the United States and the Cherokee Nation should be reopened; that their demands should be reconsidered; that the moneys which might be equitably and justly due to them should be paid, and that in the final determination of these matters they should have, if they desired it, access to the judicial tribunals of the United States. These demands were acceded to by the Government of the United States, and were ratified and approved by Congress (27 Stat. L., p. 640, §10). They found expression in the following formal agreement:
“ The United States shall, without delay, render to the Cherokee Nation, through any agent appointed by authority of the national council, a complete account of moneys due the Cherokee Nation under any of the treaties ratified in the the years 1817, 1819, 1825, 1828, 1835-36, 1846, 1866, and 1868, and any laws passed by the Congress of the United States for the purpose of carrying said treaties, or any of them, into effect; and upon such accounting, should the Cherokee Nation, by its national council, conclude and determine that such accounting is incorrect or unjust, then the Cherokee Nation shall have the right within twelve months to enter suit against the United States in the Court of Claims, with the right of appeal to the Supreme Court of the United States by either party, for any alleged or declared amount of money promised but withheld by the United States from the Cherokee Nation, under any of said treaties or Taws, which may be claimed to be omitted from, or improperly or unjustly or illegally adjusted in said accounting; and the Congress of the United States shall, at its next session, after such case shall be finally decided and certified to Congress according to law, appropriate a sufficient sum of money to pay such judgment to the Cherokee Nation, should judgment be rendered in her favor; or, if it shall be found upon such accounting that any sum of money has been so withheld, the amount shall be duly appropriated by Congress, payable to *318 the Cherokee Nation, upon the order of its national council, such appropriation to be made by Congress, if then in session, and if not, then at the session immediately following such accounting.”
There was at the time when this agreement was entered into no understanding or supposition as to how the United States should render the account called for. The representatives of the United States did not themselves know. This is shown incontestably by the fact that soon afterwards the Commissioner of Indian Affairs, in response to some inquiry, reported to the Senate:
“ I have the honor to say that if this section is construed to require the United States to state an account of moneys stipulated to be paid to the Cherokee Nation, under the treaties therein specified, and under the various appropriation acts passed to carry the same into effect, this account could be prepared by this office within a reasonable time — ■ say, about two months. If, on the other hand, it be construed to require a detailed statement of all the moneys received and disbursements made by the United States of the Cherokee funds under said treaties and acts of Congress, which seems to me to be the intention of the parties negotiating the agreement, it would require the services of an expert accountant, with assistants, probabty twelve months or more to review and copy the Cherokee accounts and records running back nearly a century. In order to prepare a statement of this kind it would require an appropriation by Congress of the sum of at least $5,000 to pay for the services of an expert accountant.”
Congress adopted the latter alternative, and, by the Act 3d March, 1893 (27 Stat. L., pp. 612, 643, § 10), appropriated $5,000 to enable the Commissioner “ to employ such expert person or persons to properly render a complete account to the Cherokee Nation of moneys due,” etc. Two accountants were selected by the Commissioner of Indian Affairs (Messrs. James A. Slade and Joseph T. Bender), who, after a prolonged examination, in 1894 handed in their account. It resulted in allowing three items of trifling amount, which the United States conceded, and in disallowing items which the Cherokee Nation claimed; and on the great and important subject in dispute — the treaty of New Echota — it found a balance of $1,111,284.70, and it allowed interest upon this *319 balance from June 12, 1838. The account sets forth, items and amounts and facts and reasons and conclusions, much in the form of an award; and it is not surprising that it was regarded by some persons as such and by other persons as having been intended to be such by the accountants. But the agreement did not provide that the account should be made by any specific person mutually agreed upon as umpire, or by clerks or accountants or auditors or arbitrators. All that it says is that “ the United States shall, without delay, render to the Cherokee Nation a comflete account.” It is the United States, one of the parties, which is to do this, and not an intermediary agreeable to both parties. The United States are left free to make up the account in any manner their please; and the account, when rendered, will not be conclusive or prima facie for or against the Cherokee Nation. The one thing that is certainly assured to the Nation, and the only thing, is that the account will be the portal through which the Cherokee Nation can carry the rights and the wrongs of its people into a judicial forum.
At this point the uncertainties and the controversies of the case begin. When the account came in (April 28, 1894) the Secretary of 'the Interior (who occupies the same position with regard to Indian nations and tribes that the Secretary of State does with regard to foreign nations) transmitted it (May 21, 1894) to the Cherokee Nation. The nation accepted it (December 1, 1894) and signified their acceptance, thereby waiving the items which the accountants had disallowed and its right to carry those rejected items into the 'courts of the United States. On January 7, 1895, the Secretary of the Interior transmitted the account, together with the acceptance of the Cherokee Nation, to the House of Representatives.
Congress did not make the appropriation in the manner prescribed in the agreement — “ such appropriation to be made by Congress if then in session, ancl if not, then at the session immediately following such accounting” — but, on the contrary, did nothing. At the end of the session the House of Representatives, on the 2d of March, 1895, called on the Attorney-General for an opinion concerning the conclusions reached by the accountants. The Attorney-General *320 made bis reply at the beginning of the next session in December following. The second session, “ the session immediately following such accounting,” passed without Congressional action of any kind. On the 20th of February, 1901, the Senate ^transmitted to the Court of Claims a bill calling for a report of the facts. On April 28, 1902, the court-transmitted to the Senate its -findings of fact under such reference, but expressed no opinion upon any question of law. Not until the 1st of July, 1902, did Congress act, and their action was merely passing the jurisdictional statute under which the court is now acting. (32 Stat. L., p. 716.)
On the trial of this case the arguments extended over a very wide range of fact and law, going back to the treaty of New Echota and coming down to the questions whether the account of Messrs. Slade and Bender could be considered as an award or as an account stated.
In the opinion of the court the account can not be regarded as an .award; in the opinion of the court it does not have one element of an award. An award is the result of an examination in some form or other by a person mutually agreed upon. In building contracts courts have constantly before them stipulations that certain things shall be decided- bjr the architect, or by the engineer in charge, whose decision shall be final. Such awards, within proper limitations, are to be upheld. But in the agreement now before us there is not so much as the suggestion of a person who shall act as umpire or of a matter to be submitted to him. All that the. agreement requires, as before has been said, is that one of the parties, the United States, shall render to the other their account. Flow they shall render it, in what form they shall render'it, to what extent they shall render it, is left entirety to themselves. ■ It is to be the account of the United States and not the account of some person acting for both parties. Before there can be an award, having the element of finality, there must be something mutually submitted to somebody. Such was not the case here.
Neither can the court regard it as an account stated. An account stated is something arising in the ordinary course of business between men having continuous business transactions. When one of them, the creditor, makes out an account *321 and the other, the debtor, accepts it, an action will lie upon it. The acceptance may be express or implied. If the one sends it and the other raises no objection to it within a reasonable time, the law merchant holds that he assents to it; and then, if he did not object when he should have 'objected, that he will be estopped from objecting. The account rendered then becomes an account stated, from which the law will imply a promise to pay the balance appearing to be due, and upon which an action may be brought. The Slade and Bender account does not contain these elements. It is the creditor and not the debtor who furnishes an account stated; it is the debtor and not the creditor who must assent to it. This account was merely “ rendered ” and by the debtor, and under a specific agreement which provides what shall be done with it. The question is not whether it ivas or was not an account stated, but what may be the liabilities of the parties under the specific agreement.
But while the account ivas neither an award nor an account stated, it must be conceded that the scope of the accounting was intended to be as broad as the causes of action secured by the agreement to the Cherokee Nation “the right within twelve months to enter suit against the United States in the Gourt of Claims for any alleged or declared amount of money promised hut withheld hy the United States from the Gheroltee Nation, under any of said treaties or laws, which may he claimed to he omitted from or improperly or unjustly or illegally adjusted in said accountings That is to say, the court, or the accountants, were to go behind statutory and -treaty bars and receipts in full and were to -consider “ any alleged or declared amount of money promised but withheld ” “ under any of said treaties or laws.” This meant that there were to be no technical defenses set up, no pleas of res judicata, no releases or relinquishments, compromises or settlements; or it meant nothing. For if the proposed suit of the Cherokees was to be decided strictissimi juris, i. e., upon technical defenses, it had already been decided against them.
That decision was not against the Cherokee Nation, but it was against Cherokee citizens. The Cherokees have main- *322 tamed from tlie 'first and always that to make them pay for their removal from homes which they did not wish to leave to a country to which they did not wish to go was a monstrous abuse of the obscure provisions of a treaty which they bad not read, which they had not signed, and to which they had not in fact been parties. “ Immediately before, and up • to the time of the eviction of the Cherokees, the Government had been carrying on a negotiation with their delegates who had submitted certain propositions looking toward a new treaty. On the 18th of May, 1838, Mr. Poinsett, Secretary of War, communicated his objections of them to the delegates, but at the same time made to them an offer, the substance of which was that if the Cherokees would ‘ remove peaceably and contentedly to their new homes in the West ’ the United States would defray the expenses of their removal and subsistence. This offer bears date only five days before the eviction began. It was not accepted by the Cherokees, but seems to have been tacitly acquiesced in, they removing peaceably if not contentedly, .and subsequently claiming that the cost of removal and subsistence should not be borne by themselves.” (Western Cherokees v. United States, 27 C. Cls. R., 1, 44.) Yet the court was obliged in that case to hold, according to the letter of the law (the treaties, the statutes, the acquittances) ,that the cost of removal was to -be a charge upon the $5,00t),000 treaty fund and to be borne by the Cherokees.- It is manifest that the agreement, here, intended something more than that the Cherokees might come into court to be immediately turned out under previous decisions. Interpreted in the light of the long, sore controversy which had existed between the parties, it is plain that the Cherokees believed the agreement to mean (and the United States allowed them so to believe) that all of their claims and rights and equities were to be reopened and reexamined de nooo; and that upon the faith of that belief they made a cession of the Outlet.
In the opinion of the court this case is simply one to recover purchase money upon a contract of sale. Ordinarily, in such a case, the cession would not be made, the deed would not be delivered until the purchase money is paid *323 or secured or, at least, the amount be ascertained and liquidated. In this case both parties wanted to expedite the transaction. It was important for the United States that the cession of the territory should be made immediately; it was desirable for the Cherokee Nation that the purchase money should be paid soon. But, nevertheless, the Cherokee Nation had the right to immediate payment, and the agreement intended to secure to them the next thing to it — the right to an early payment. The accounting was merely a means to an end. The end was the immediate payment, as near as might be, of the whole consideration to be given for the cession of the Outlet. When the cession was made the purchase money was due; the only thing remaining, which was the object of the accounting, was to ascertain the exact amount. This is not the case of a party, prosecuting an un-liquidated debt, but a case of sale and delivery and nonpayment of the purchase money for the thing sold and delivered. The United States were willing to pay; the Cherokee Nation wanted the payment made at the earliest possible day; both parties agreed upon a method by which it should be paid as nearty immediately as was possible. The United States were to render their account “ without delay; ” if the Cherokee Nation accepted it, the amount was to be appropriated by Congress; such “ appropriation to be made by Congress, if then in session, and if not, then at the session immediately following such accounting.” If the Cherokee Nation. did not accept the accounting, or regarded it as incorrect or unjust, and carried it into the courts and recovered a judgment, Congress was to appropriate “ at its next session after such case shall be finally decided.” Nothing was left to the ordinary uncertainties and procrastinations of legislation, and no agreement could have made the obligation to pay promptly more unequivocal and specific. Time was of the essence of the contract, so far as the words of the parties could make it.
The court does not intend to imply that when the account of Slade and Bender came into the hands of the Secretary of the Interior he was bound to transmit it to the Cherokee Nation. On the contrary, the Cherokee Nation had not *324 agreed to be bound by the report of the accountants and could not claim that the United States should be. The accountants were but the instrumentality of the United States in making out an account. When it was placed in the Ulterior Department it was as much within the discretion of the Secretary to accept and adopt it or to remand it for alterations and corrections as a thing could be. He was the representative of the United States under whom the agreement had been made, and he was the authority under which the account had been made out, and when he transmitted it to the Cherokee Nation his transmission was the transmission of the United States. When the account was thus received by the Cherokee Nation (May 21, 1894), the “ twelve' months ” of the agreement, within which the nation must consider it and enter suit against the other party in the Court of Claims, began to run, and with the nation’s acceptance of the account (December 1, 1894) the session of Congress at which an appropriation should be made became fixed and certain. The Secretary did not recall the account; the United States never rendered another, and the utmost authority which Congress could have exercised, if any, was, at the same session, or certainly within the prescribed twelve months,” to have directed the Secretar})' to withdraw the account and notify.the Cherokee Nation that another would be rendered. The action of the Secretary of the Interior, combined with the inaction of Congress to direct anything to the contrary, makes this prolusion of the agreement final and conclusive. The Cherokee Nation has parted with the land, has lost the time within which it might have appealed to the courts, and has lost the right to bring the items which it regards as incorrectly or unjustly disallowed to judicial arbitrament, and the United States are placed in the position of having broken and evaded the letter and spirit of their agreement.
When the agreement is analyzed it seems plain that if the court were to uphold the course which the United States have pursued it would have to adopt one of two alternatives: Either it would have to read into the agreement provisions which are not there and which are the converse of those *325 which, are there (that it was the Cherokee Nation, and not the United States, which was to render the account; that it was the United States, and not the Cherokee Nation, which might object to the account; that.it Avas the United States, and not the Cherokee Nation, .to whom judicial redress A\ras given), or it Avould have to hold that the agreement promised nothing, assured nothing, gave no judicial means of redress, and left the Cherokee Nation in precisely the same plight that it would have been in if no agreement had been made, to wit, with a controversy of nearly seventy years still unsettled.
The question which next arises relates to the contending parties before the court — the Cherokee Nation, being the Cherokee government, the Eastern Cherokees, being the communal owners.
The contracting party here, being also the party who made the conveyance of the Cherokee Outlet, was the Cherokee Nation; and if the lands of the Cherokees Avere, like the lands of the United States, Government lands, or public lands in which the Government has the sole proprietary interest, and in which no individual has any personal interest whatever, there could not be a doubt of the exclusive right of the Cherokee Nation to have a judgment awarded in its name. But in 1835 the lands of the Cherokees east of the Mississippi, and in 1846 the lands of the Cherokees in the Indian Territory, were neither public nor private lands- in the ordinary sense of those terms. The term “ communal,” it is believed, is not to be found in treaties or statutes or public documents relating to the Indians prior to the date of the case of the Western Cherolcees (27 C. Cls. R., 1). But the officers of the Government, under stress of circumstances— that is to say, the expectations of the Indians — have always treated Indian lands as communal, though they did not use the term and had very dim perceptions as to the nature of the estate. Whenever the Government has paid for a cession of Indian land per capita to every member of an Indian community, share and share alike, it was because the Indians knew that their lands were communal property and that they, as communal owners, were entitled to the purchase *326 money. The case of the Western Cherokees (supra) is so nearly identical to the present one as regards the parties claimant that the opinion in that case correctly sets forth the facts and the law of the present one:
“ The lands east of the Mississippi were not vested in the Cherokee government, as distinguished from the Cherokee people. Their chiefs in council, as representative of the body politic, might, perhaps, have sold or disposed- of them, but under their constitution and laws could not have brought an action of trespass or ejectment against one of their own citizens for dwelling upon or hunting over the lands. The title was not vested in the Cherokees as individuals. They were neither tenants in common nor j oint tenants. The individual Cherokee' had no vested right which he could convey or devise or make the subject of a suit in partition. If he withdrew from the community he left all rights behind him, and if a stranger was admitted he acquired a right by virtue of his admission alone. The property was communal — a property wherein every person, not as an individual, but as a member of the community, held an equal, indistinguishable, indivisible right of user, and nothing more.”' (Western Cherokees v. United States, 27 C. Cls. R., 1, 53.)
The present case is also complicated by the fact that a considerable portion of these communal owners are neither citi-. zens of the Cherokee Nation nor subject to its jurisdiction nor dwellers within its territory, but are and always have been residents of territory east of the Mississippi, owing-allegiance, now exclusively to the United States. It is also complicated by the fact that the account rendered by the United States to the Cherokee Nation is made up of four distinct and essentially different items: One, the chief one, is for money erroneously charged to the Cherokees instead of being divided per capita among them; another is for money which should have been added to the principal of the school fund, a fund which is held by the United States in trust; a third is for money improperly charged to the Cherokee national fund, likewise held in trust by the United States. Only one appears to be money properly due to the Cherokee Nation as a government, and that for the inconsiderable amount of $432.28. The case is further complicated by the fact that the government of the Cherokee Nation is *327 passing away'; that it has already ceased to possess a judiciary, and that on the 4th of March, 1906, it will, to all intents and purposes, expire.
The action instituted in this court by the Cherokee Nation was properly an action at law to recover a liquidated amount of money upon an express contract. But the act 1st July, 1902 (32 Stat. L., p. 716, § 68), under which itpvas instituted, authorized the court to adjudicate any claim which the Cherokee Nation “ or any band thereof ” might have against the United States, with. “ full authority by proper orders and process to make parties to any such suit all persons tallóse presence in the litigation it may deem necessary or proper to the final determination of the matter in controversy.” The supplemental act 3d March, 1903 (32 Stat. L., p. 996), expressly authorized “the Eastern Cherokees, so called, including those in the Cherokee Nation and those who remained East of the Mississippi Biver,” to come in and prosecute their claims, with power to the court “ also to determine as between the different claimants to whom the judgment so rendered' equitably belongs.” The case then being that of many persons severally interested in a common fund, is one of which equity takes jurisdiction and the several suits merged by interpleader into one have become a suit in equity.
While the United States háve always, or nearly always, treated the members of an Indian tribe as communal owners, they have never required that all the communal owners shall join in the conveyance or cession of the land. From the necessities of the case the negotiations have been with representatives of the owners. The chiefs and headmen have ordinarily been the persons who carried on the negotiations and who signed the treaty. But they have not formed a body politic or a body corporate, and they have not assumed to hold the title or be entitled to the purchase money. They have simply acted as representatives of the owners, making the cession on their behalf, but allowing them to receive the consideration per capita. In the present case the Cherokee Nation takes the place, so far as communal ownership is involved, of the chiefs and headmen *328 of tlie uncivilized tribes. This, too, is consonant with the usage of nations. The claims of individuals against a foreign power are always presented, not bjr them individually, but by their 'Government. The claims are pressed as international, but the money received is received in trust, to be paid over to the persons entitled to it.
As to those Cherokees who remained in Georgia and North Carolina, in Alabama and Tennessee, they owe no allegiance to the Cherokee Nation and the nation owes no political protection to them. But they, as communal owners of the lands east of the Mississippi, at the time of the treaty of 1835, were equally interested, with the communal owners who were carried to the West, in the $5,000,000 fund which was the consideration of the cession, so far as it was to be distributed per capita. The Cherokee Nation was not bound to prosecute their claims against the United States for the unpaid balance of the $5,000,000 fund, but their rights were inextricably interwoven with the rights and equities of Cherokees who were citizens of the nation, and the nation properly made no distinction when parting with the Outlet but demanded justice from the Cherokee point of view for all Cherokees who had been wronged by the nonfulfillment of the treaty of New Echota. As to these Eastern nonresident Cherokee aliens the nation acted simply as an attorney collecting a debt. In its hands the moneys would be an implied trust for the benefit of the equitable owners.
After a careful consideration of the circumstances and conditions of these cases, the court is of the opinion that the moneys awarded should be paid directly to the equitable owners. A great change has come within a few years, both as to the powers and the responsibilities of the Cherokee Nation. Its statute went to the full extent of the civil law in making the Government liable to all persons being citizens of the nation: “ The Cherokee Nation shall be liable to all persons whatever, citizens of the nation, having claims at law or equity against her to the same extent as individual persons are liable to each other and may be sued by any citizen having a cause of action.” (Code 1874, p. 240, *329 § 130.) But its judiciary has ceased to exist, and, as before has been said, the nation itself as a government will soon cease to exist.
“ The constitution of the Cherokees was á wonderful adaptation to the circumstances and conditions of the time, and to a civilization that was yet to come. It was framed and adopted by a people, some of whom were still in the savage state and the better portion of whom had just entered upon that stage of civilization which is characterized by industrial pursuits, and it was framed during a period of extraordinary turmoil and civil discord, when the greater part of the Cherokee people had just been driven by military force from their mountains and valleys in Georgia, and been brought by enforced immigration into the country of the Western Cherokees; when a condition of anarchy and civil war reigned in the Territory — a condition which was to continue until the two branches of the nation should be united under the treaty of 1846 (27 C. Cls. R., 1) ; yet for more than half a century it has met the requirements of a race steadily advancing in prosperity and education and enlightenment so well that it has needed, so far as they are concerned, no material alteration or amendment, and deserves to be classed among the few great works of intelligent statesmanship which outlive their own time and continue through succeeding generations to assure the rights and guide the destinies of men. And it is not the least of the successes of the constitution of the Cherokees that the judiciary of. another nation are able, with entire confidence in the clearness and wisdom of its provisions, to administer it for the protection of Cherokee citizens and the maintenance of their personal and political rights.” (Journeycake v. Cherokee Nation, 28 C. Cls. R., 281, 317.)
Since those words were written a hopeless development has taken place in the affairs of this people. It has been with them as it has been with other nations — as it has been with families and individuals — to rise in the times of their tribulation, but to sink under the enervating blessings of prosperity.
“ On the 1st August, 1838, while the dispirited throng of Cherokee exiles paused in their march at a temporary halting place, the name of which does not appear on the map nor inthe list of post-offices, and which is known only from what transpired there'as ‘Aquohee camp,’ they were able to de *330 clare through the hand of their great statesman and leader, Boss, that—
“ Whereas the Cherokee people have existed as a distinct national community in the possession and exercise of the appropriate and essential attributes of sovereignty for a period extending into antiquity beyond the dates and record and memory of man; •
“And, whereas these attributes, with the rights and franchises which they involve, have never been relinquished by the Cherokee people, but are now in full force and virtue;
“And whereas the natural, political, and moral relations subsisting among the citizens of the Cherokee Nation toward each other and toward the body politic can not, in reason and justice, be dissolved by the expulsion of the nation from its own territory by the power of the United States Government :
“Resolved, therefore, by the national committee and council and people of the Cherokee Nation, in general council assembled, That the inherent sovereignty of the Cherokee Nation, together with the constitution, laws, and usages of the same, are, and by the authority aforesaid are hereby declared to be, in full force and virtue, and shall continue so to be in perpetuity, subject to such modifications as the general welfare may render expedient.” (Western Cherokees v. United States, 27 C. Cls. R., 1, 29.)
This declaration was an heroic resolve amid the most adverse circumstances to preserve forever the autonomy of the Cherokee people. It was not made in vain for the generation which so resolved. But the ease of affluence and the inevitable demoralization of wealth have accomplished where the military power of the United States and the corrupt methods of their agents failed; and within the passing of less than three generations the perpetuity of the constitution and laws and usages of the Cherokee people will have come to an end.
In this condition of affairs the court must regard the Cherokee Nation as in a condition somewhat analogous to that of a trustee or receiver who has become insolvent; that is to say, as a person who should not be intrusted with the receipt and distribution of the moneys belonging to other persons.
The persons to whom distribution of this fund of $1,111,-284.70, with accrued interest, would be made if they were *331 now living would be the communal OAvners of the Cherokee lands east of the Mississippi. By the tripartite treaty of 1846 the Western and the Eastern Cherokees AArere placed on the same footing Avith regard to all lands east of the Mississippi and with regard to the funds derived from them. It folloAA’s necessarily that each and all of the present communal oAAmers, Avhether on the east or the Avest of the Mississippi, and whether the descendants of Eastern or Western Cherokees, haA'c the same individual interest in the fund and AA'ill be entitled to like amount per capita.
xV decree will be entered in this case following the form of that Ayhich was entered in the case of Whitmire, trustee, v.‘ Gherokee Nation (30 C. Cls. R., 180). It Avill provide:
That the Cherokee Nation recover upon the agreement Avith the United States concluded on the 19th December, 1891, and ratified by the United States 3d March, 1893 (27 Stat. L., p. 640, § 10), the amounts found due in the account rendered thereunder by the United States, to Avit:
The value of three tracts of land containing 1,700 acres, a-t $1.25 per acre_ $2,125. 00
Amount paid for removal of Eastern Cherokees to the Indian Territory_ 1,111,284.70
Amount received by receiver of public moneys at Independence, Kans-x_:- ' 432. 28
Interest on $15,000 of Choctaw funds, applied in 1803 to relief of indigent Cherokees_ 20, 400. 25
That the amount of $2,125, with interest thereon from February 27, 1819, to date of payment, nevertheless be retained by the Secretary of the Interior and credited by the United States to the principal of the Cherokee school fund in their possession and of Avhich they are trustees;
That the amount of $20,406.25, together Avith interest thereon from July 1, 1893, to date of the restoration of the fund, be likeAvise retained by the Secretary of the Interior and credited to the Cherokee national fund in the possession of the United States and of which they are trustees;
That the amount of $1,111,284.70, together with interest thereon from June 12, 1838, to a day when the Secretary of the Interior shall be ready to make payments, as hereinafter provided, nevertheless be paid directly to communal owners *332 being Cherokees by blood, whether on the eastern or western side of the Mississippi River. And to that end the Secretary of the Interior is authorized to appoint one or more commissioners to proceed to the Cherokee country and to the country of the Cherokees residing east of the Mississippi to ascertain and report to the Secretary the facts necessary for the formation of rolls of all Cherokees by blood, the expenses of making out and preparing such rolls to be a charge upon and paid out of the fund awarded by the decree.
The decree will also provide for the payment of the fund to the parties per capita, the charge of distribution likewise to be a charge upon the fund.
The decree will also provide for the payment to the treasurer of the Cherokee Nation $432.28, together with interest thereon from January 1, 1874, to date of payment, as likewise set forth in said account.
The decree will also provide for the compensation of counsel and expenses and disbursements incident to the litigation.