Williams, Judge,
delivered the opinion of the court:
The plaintiffs in their group capacity were one of the parties to the treaty of 1846 (9 Stat. 871) between the United States and the Cherokee Nation of Indians, the Western or Old Settler Cherokees being the other party. The plaintiffs under the terms of the jurisdictional act are authorized to institute suit in their own name, or to act jointly with the Western or Old Settler Cherokees, or to intervene in any suit or suits now pending in the court under *198 the authority of the act of Congress of March 19, 1924 (43 Stat. 21, 28), in which the Cherokee Nation is party plaintiff and the United States is party defendant. They have elected to bring suit in their group capacity.
The jurisdictional act confers authority on the Court of Claims, notwithstanding the lapse of time or the statute of limitaiton “to hear, examine, adjudicate, and render judgment in any and all legal and equitable claims arising or growing out of any treaty or agreement between the United States and the Cherokee Indians, or arising or growing out of any act of Congress in relation to Indian affairs, which the said Eastern or Emigrant * * * Cherokees may have against the United States, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States and paid in full.”
The plaintiffs in the petition assert two causes of action:
1. The balance of the principal sum agreed to be paid by the terms of the treaties of 1835 and 1846, by defendant to plaintiffs, amounting to $1,989,218.49, together with interest thereon at the rate of 5% per annum from March 15, 1910, until paid.
2. The balance due for interest on said sum at 5% per annum from April 5, 1852, to March 15, 1910, amounting to $664,311.63.
It is alleged that this claim has not been heretofore determined and adjudicated on its merits by the Court of Claims or the Supreme Court of the United States and paid in full.
Prior to the year 1817 the Cherokee Indians lived east of the Mississippi. By the treaties of 1817 (7 Stat. 156) and 1819 (7 Stat. 195) they made a cession of certain of their lands in Georgia, Tennessee, and Alabama to the United States and received in exchange therefor lands in the Territory of Arkansas on the Arkansas and White Rivers, to which lands a part of the Cherokees emigrated and thereafter had their homes. These Cherokees were thereafter known as Western Cherokees or Old Settlers. By the treaty of 1828 (7 Stat. 311) the Western Cherokees or Old Settlers exchanged their lands in Arkansas for other lands in what *199 is now the State of Oklahoma. The description of the lands granted to the Western Cherokees in this treaty was corrected by the supplementary treaty of 1833 (7 Stat. 414). The Western Cherokees alone were parties to these treaties and they were the sole owners of the lands granted to them by the two treaties, the Cherokees then remaining east of the Mississippi, known as the “Eastern Cherokees”, having no interest and claiming no interest therein. The Eastern Cherokees were the sole owners of the Cherokee lands lying east of the Mississippi River, the Western Cherokees or Old Settlers having no interest, and claiming no interest in such lands.
By the terms of the treaty of December 29, 1835 (7 Stat. 478), the Eastern Cherokees ceded all their lands east of the Mississippi River to the United States. The consideration for the cession was $5,000,000, less certain stipulated deductions. One of the provisions of the treaty was that the Cherokees would remove to the lands in Oklahoma granted to the Western Cherokees, or Old Settlers, in the treaties of 1828 and 1833, which lands, the United States agreed, together with the lands ceded in this treaty, “shall be included in one patent executed to the Cherokee Nation of Indians by the President of the United States according to the provisions of the act of May 28, 1830.” This treaty, known as the treaty of New Echota, became a subject of bitter controversy from the day of its promulgation, the Cherokee people claiming that it had been falsely executed in their name by unofficial and unauthorized persons. In speaking of it, this court in The Cherokee Nation v. United States, 40 C. Cls. 252, said:
It is enough to say that “the treaty of New Echota was the act and deed of neither the Eastern nor Western Cherokees”, and that neither the Cherokee people nor the Cherokee government ever acknowledged it.
However, both the Eastern or Emigrant Cherokees, as the Eastern Cherokees became known after their removal from their eastern lands to Indian Territory, and the Western Cherokees or Old Settlers became parties to the treaty of New Echota by virtue of the treaty of 1846 (9 Stat. 871) *200 to which they were both parties. In this treaty, among other things not material here, the United States agreed to “make a fair and just settlement of all moneys due to the Cherokees, and subject to the per capita division under the treaty of the 29th December 1835”, less certain credits from the sum of $6,647,067.00 for disbursements made in accordance with the terms of that treaty and the supplement thereto of 1836.
In 1849 the accounting officers of the United States prepared a statement of the account contemplated in the treaty of 1846, in which statement a balance of $627,603.95 was shown to be due the Cherokee Indians. This sum, together with the additional sum of $96,999.42 found to be due the Cherokees by the Senate Committee on Indian Affairs, or a total sum of $724,603.37, with interest thereon at the rate of 5 percent per annum from June 12, 1838, was duly appropriated by Congress in the act of February 27, 1851 (9 Stat. 572). Congress also by the act of September 30, 1850 (9 Stat. 556), appropriated the sum of $189,422.76, which sum the Senate, acting as umpire under the provisions of the treaty of 1846, had found to have been improperly charged against the treaty funds of the plaintiffs, together with interest thereon at the rate of 5 percent per annum from June 12, 1838. These two sums aggregating $914,-026.13, with the interest thereon computed in the manner stated, were subsequently, as of April 5, 1852, disbursed to plaintiffs.
Although the Cherokee Indians had, upon the receipt of the foregoing payments, accepted the same as “full satisfaction and a final settlement of all claims and demands whatsoever of the Cherokee Nation against the United States, under any treaty heretofore made with the Cherokees”, they were dissatisfied with the settlement and persistently contended for a period of forty years that they had been improperly charged with a large part of the cost of the removal of the Eastern Cherokees to their new home in the west. This contention was urgently made by the Cherokees in the negotiations between them and the United States in 1891, looking to the purchase by the United States of a large part *201 of tbeir remaining lands. They refused to make a further cession of lands except upon the condition that past treaty transactions between them and the Government be reopened and reexamined. The United States acceded to this demand with the result that the following provision was incorporated in the agreement which was ratified by the act of March 3, 1893 (27 Stat. 640) :
The United States shall, without delay, render to the Cherokee Nation, through any agent appointed by authority of the national council, a complete account of moneys due the Cherokee Nation under any of the treaties ratified in the years 1817, 1819, 1825, 1828, 1835-36, 1846, 1866, and 1868, and any laws passed by the Congress of the United States for the purpose of carrying said treaties, or any of them, into effect; and upon such accounting, should the Cherokee Nation, by) its national council, conclude and determine that such accounting is incorrect or unjust, then the Cherokee Nation shall have the right, within twelve months, to enter suit against the United States in the Court of Claims, with the right of appeal to the Supreme Court of the United States by either party, for any alleged or declared amount of money promised but withheld by the United States from the Cherokee Nation, under any of said treaties or laws, which may be claimed to be omitted from, or improperly or unjustly or illegally adjusted in, said ac-countings ; and the Congress of the United States shall at its next session, after such case shall be finally decided and certified to Congress according to law, appropriate a sufficient sum of money to pay such judgment to the Cherokee Nation, should judgment be rendered in her favor; or if it shall be found upon such accounting that any sum of money has been so withheld, the amount shall be duly appropriated by Congress, payable to the Cherokee Nation, upon the order of its national council, such aj)propriation to be made by Congress, if then in session, and if not, then at the session immediately following such accounting.
In compliance with the foregoing provision of the agreement, Messrs. Slade and Bender, two expert accountants, were employed for the purpose of making the required accounting. They prepared and made their report in 1894. The report is set out in full in finding 9, and only the summary need be stated here:
The foregoing statement covers, it is believed, every point at issue which can be raised under the treaties described in the articles of *202 agreement; (a number of demands made by the Cherokee Nation were disallowed), and the result of the finding is submitted in the following schedule:
Und'er the treaty of 1819:
Value of three tracts of land containing 1,700 acres, at $1.25 per acre, to be added to the principal of the “School” fund_ $2,125. 00
(With interest from February 27, 1819, to date of payment)
Under treaty of 1835:
Amount paid for removal of Eastern Cherokees to the Indian Territory, improperly charged to treaty fund_1, 111, 284. 70
(With interest from June 12, 1838, to date of payment.)
Under treaty of 1866 :
Amount received by receiver of public moneys at Independence, Kansas, never credited to Cherokee Nation_ 432. 28
(With interest from January 1, 1874, to date of payment.)
Under act of Congress, March 3, 1893:
Interest on $15,000 of Choctaw funds applied in 1863 to relief of indigent Cherokees, said interest being improperly charged to Cherokee national fund_ 20, 406. 25
(With interest from July 1, 1893, to date of restoration of the principal of the Cherokee funds held in trust in lieu of investments.)
The report of Messrs. Slade and Bender was transmitted to the Cherokee Nation by the Secretary of the Interior and was accepted and approved by formal action of the Cherokee national council. Congress, however, failed to make an appropriation for the amount shown in the report to be due the Cherokee Nation, as the agreement provided should be done, but in the act of July 1, 1902 (32 Stat. 726), vested this court with jurisdiction to “examine, consider, and adjudicate, with a right of appeal to the Supreme Court of the United States by any party in interest feeling aggrieved at the decision of the Court of Claims, any claim which the Cherokee tribe, or any band thereof, arising under treaty stipulations, may have against the United States, upon which suit shall be instituted within two years after the approval of this Act; and also to *203 examine, consider, and adjudicate any claim which- tbe United States may have against said tribe, or any band thereof. The institution, prosecution, or defense, as the case may be, on the part of the tribe or any band, of any such suit, shall be through attorneys employed and to be compensated in the manner prescribed in sections twenty-one hundred and three to twenty-one hundred and six, both inclusive, of the Revised Statutes of the United States, the tribe acting through its principal chief in the employment of such attorneys, and the band acting through a committee recognized by the Secretary of the Interior. The Court of Claims shall have full authority, by proper orders and process, to make parties to any such suit all persons whose presence in the litigation it may deem necessary or proper to the final determination of the matter in controversy, and any such suit shall, on motion of either party, be advanced on the docket of either of said courts and be determined at the earliest practicable time.”
By the act of March 3, 1903 (32 Stat. 996), it was provided that the foregoing provision:
* * * shall be so construed as to give the Eastern Cherokees, so called, including those in the Cherokee Nation and those who remained east of the Mississippi River, acting together or as two bodies, as they may be advised, the status of a band or bands, as the case may be, for all the purposes of said section: Provided, That the prosecution of such suit on the part of the Eastern Cherokees shall be through attorneys employed by their proper authorities, their compensation for expenses and services rendered in relation to such claim to be fixed by the Court of Claims upon the termination of such suit; and said section shall be further so construed as to require that both the Cherokee Nation and said Eastern Cherokees, so called, shall be made parties to any suit which may be instituted against the United States under said section upon the claim mentioned in House of Representatives Executive Document Numbered Three hundred and nine of the second session of the Fifty-seventh Congress; and if said claim shall be sustained in whole or in part the Court of Claims, subject to the right of appeal named in said section, shall be authorized to render a judgment in favor of the rightful claimant, and also to determine as between the different claimants, to whom the judgment so rendered, equitably belongs either wholly or *204 in part, and shall be required to determine whether, for the purpose of participating in said claim, the Cherokee Indians who remained east of the Mississippi Diver constitute a part of the Cherokee Nation, or of the Eastern Cherokees, so called, as the case may be.
Under the authority of these acts three petitions were filed in this court, one by the Cherokee Nation, no. 23199, one by the Eastern Cherokees, no. 23124, and one by the Eastern and Emigrant Cherokees, no. 23212 (the plaintiffs herein), all of which petitions sought recovery for the several amounts shown to be due the Cherokee Nation by the Slade and Bender report, together with the interest specified therein. The three cases were consolidated for both a hearing and judgment, upon which hearing a judgment was awarded the Cherokee Nation for the amounts shown to be due in the report, $1,134,248.23. In rendering judgment the court said:
A decree will be entered in this case following the form of that which was entered in the case of Whitmire, trustee, v. Cherokee Nation (30 C. Cls. R., 180). It will provide:
That the Cherokee Nation recover upon the agreement with the United States concluded on the 19th December 1891, and ratified by the United States 3d March 1893 (21 Stat. L., p. 640, § 10), the amounts found due in the account rendered thereunder by the United States, to wit:
The value of three tracts of land containing 1,700 acres, at $1.25 per acre- $2,125. 00
Amount paid for removal of Eastern Cherokees to the Indian Territory_1, 111, 284.70
Amount received by receiver of public moneys at Independence, Kans_ 432. 28
Interest on $15,000 of Choctaw funds, applied in 1863 to relief of indigent Cherokees_ 20,406. 25
* * * That the amount of $1,111,284.70, together with interest thereon from June 12, 1838, to a day when the Secretary of the Interior shall be ready to make payments, as hereinafter provided, nevertheless be paid directly to communal owners being Cherokees by blood, whether on the eastern or western side of the Mississippi Diver.
The judgment of this court was affirmed by the Supreme Court in United States v. Cherokee Nation (202 U. S. 101), with a modification of that part of the decree directing the manner of the distribution of the $1,111,284.70 charged *205 against the treaty fund for the removal of the Eastern Cherokees west, the court saying:
* * * but we think that the terms of the second subdivision of the fourth paragraph of the decree, in directing that the distribution be made to “the Eastern and Western Cherokees”, are perhaps liable to misconstruction, although limited to those “who were parties either to the treaty of New Echota as proclaimed May 23, 1836, or the treaty of Washington of August 6, 1846, as individuals, whether east or west of the Mississippi River.” This should be modified so as to direct the distribution to be made to the Eastern ■Cherokees as individuals, whether east or west of the Mississippi, parties to the treaties of 1835-36 and 1846, and exclusive of the Old Settlers.
Congress appropriated the moneys necessary to pay the foregoing judgment and interest thereon from June 12,1838, in full, and there was subsequently paid to the plaintiffs in the manner directed by the decree of the court, their rightful part thereof, $5,098,361.08.
It is alleged in the petition that after the stipulated deductions had been made from the sum of $6,647,067.00 guaranteed to plaintiffs in article IX of the treaty of 1846, there remained a balance due plaintiffs of $2,067,539.14, which fund under the resolution of the Senate of September 5, 1850, was an interest-bearing fund at the rate of 5 percent per annum until paid; that no part of this sum of $2,067,-539.14 or any interest thereon was paid until April 5, 1852, at which time there was due and owing, including principal and interest, the sum of $3,495,557.27; that on that date a payment was made of $1,506,338.78; that this payment properly applied would have extinguished the whole of the interest due and reduced the principal sum by $78,320.65, thus leaving an unpaid balance of the principal .sum of $1,989,218.49 bearing interest at the rate of 5 percent until paid; that no further payment was made until March 15,1910, at which time there was due in principal and interest the sum of $7,751,957.20; that on March 15, 1910, a payment of $5,098,361.08 was made on the account; that this payment properly applied was insufficient to liquidate the accrued interest amounting to $5,762,738.71, leaving a bal- *206 anee thereof amounting to $664,377.63 still due and unpaid, in addition to the principal sum of $1,989,218.49, or a total balance then due and unpaid of $2,653,596.12, and that no further payment on the account has been made. The account thus stated would stand:
Balance of principal sum due as of June 12, 1838_$2,067,539.14
Interest on principal sum from June 12, 1838, to April 5, 1852_ 1, 428, 018.13
Amount of principal and interest due April 5, 1852- 3, 495, 557.27
Amount paid April 5, 1852_ 1, 506, 338.78
Balance due on principal sum April 5, 1852- 1, 989,218.49
Interest on unpaid balance of principal sum from April 5, 1852, to March 15, 1910_ 5, 762,738. 71
Total amount principal and interest due March 15, 1910___ 7,751, 957. 20
Amount paid March 15, 1910- 5,098, 351.08
Amount of interest due and unpaid March 15, 1910- 664, 377. 63
Amount of principal sum due and unpaid March 15, 1910_ 1,989,218.49
Total amount of principal sum and earned interest unpaid March 15, 1910- 2, 653, 596.12
The difference between the account as now stated by plaintiffs and as it was found and stated by the court in the consolidated Cherokee cases (40 C. Cls. 252) is found in the application of the payment of $1,506,338.78 made as of April 5, 1852, of which amount $914,026.13 was appropriated by Congress for the payment of the balance of the principal fund then ascertained to be due and unpaid and the remainder as interest thereon.
The plaintiffs contend that upon the rendition of the decree in the case of The Cherokee Nation v. United States (40 C. Cls. 252), awarding judgment for the $1,111,284.70 which had wrongfully been deducted from the principal sum as part of the expense of removal of the Eastern Cherokees, together with interest thereon from June 12, 1838, until paid, it became the duty of the accounting officers of the Government to adjust the accounts in respect to the interest-bearing principal sum in accordance with the law applicable to such matters, which it is asserted would have been that shown in the readjusted account upon 'which plaintiffs rely. The accounting officers of the Government *207 having failed to do this it is contended that the question of a correct accounting of the principal fund and interest thereon is now raised for the first time and has not “heretofore been determined and adjudicated” on its merits. These contentions have been urged with great earnestness and ability by plaintiffs’ counsel, and also by counsel in the case of Cherokee Nation v. United States, L-174, where recovery is sought on the same claim.
We think the judgment of this court in the case of The Cherokee Nation v. United States, supra, affirmed by the Supreme Court in United States v. Cherokee Nation, supra, was a final determination and adjudication of any and all claims of plaintiffs against the United States growing out of the provisions of article IX of the treaty of 1846, both as to the principal sum therein guaranteed to be paid to plaintiffs and interest thereon. The jurisdictional act under which the judgment in that case was awarded conferred jurisdiction on the court to “examine, consider, and adjudicate any claim” which the Cherokee tribe, or any band thereof, arising under treaty stipulations, “may have against the United States.” The plaintiffs here are the same Eastern and Emigrant Cherokees who were plaintiffs in one of three consolidated cases on which the hearing was had and judgment was entered in that case. Plaintiffs in that case sought recovery of a large sum alleged to be due and unpaid on the sum of $6,647,067.00 guaranteed to be paid to them in article IX of the treaty of 1846, together with interest on the same. The claim was heard and adjudicated on the merits, judgment being awarded for the amount claimed, both principal and interest, and was paid in full. The same plaintiffs now allege there is a large balance due and owing to them on the same principal fund that was at issue and adjudicated in the consolidated Cherokee cases, together with interest thereon. The plaintiffs, it is true, have readjusted the account and stated it differently than in the former cases in which judgment was awarded, but the fact remains and is crystal clear that the subject matter in the instant case and in Cherokee Nation v. United States, supra, is precisely the same. The claim presented is for an amount, principal, and interest, alleged to be due plaintiffs *208 under the provisions of article IX of the treaty of 1846, and the Senate Resolution of September 5,1850. This identical issue was presented, determined, and adjudicated in the former case.
The plaintiffs construe the proviso appearing in section 8 of the jurisdictional act as directing the court, and investing it with authority, to readjust the account as it was stated in Cherokee Nation v. United States, supra, and United States v. Cherokee Nation, supra, by applying the payments made in April 5, 1852, and March 15, 1910, in the manner plaintiffs contend they should have been applied by the accounting officers of the Government. The proviso reads:
Provided, however, that in any claim sued on by said Cherokees for any part of an interest-bearing fund upon which account any payment or payments shall have been made, such payment or payments shall first be applied to reduction or payment of interest earned to the date of such respective payments, and the balance, if any, shall then be applied to reduce the interest-bearing principal and not otherwise.
The proviso as we construe it is purely procedural. It lays down the manner in which partial payments are to be applied on claims sued upon which come within the jurisdiction of the court as defined in section 1 of the Act. The court’s jurisdiction as defined in section 1 is expressly limited to claims which have not “heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States and paid in full.” The proviso in no way changes or enlarges the jurisdiction thus conferred. It has application only to such claims as plaintiffs have a right to assert, and the court has the right to hear and determine under the provisions of section 1 of the jurisdictional act.
The payments made on April 5, 1852, and March 15, 1910, were applied in strict accordance with the Senate Resolution of September 5, 1850, both in respect to the principal sum and the interest due thereon. Plaintiffs were entitled to interest on the principal sum guaranteed to them in article IX of the treaty of 1846 because, and only because, the Senate acting as umpire under the authority of section XI *209 oí the treaty decided “that interest at the rate oí five percent per annum should be allowed upon the sums found due the Eastern and Western Cherokees, respectively, from the twelfth day of June, eighteen hundred and thirty-eight, until paid.” The principal sum due was not a treaty in-¿erest-bearing fund. Under the Senate resolution interest jecame due on the principal fund when the fund was paid, and until that was done no liability devolved upon the defendant to pay interest. In 1852, it having been before that time determined that the sum of $914,026.13 was due plaintiffs on the principal sum, and the necessary funds having been appropriated therefor, payment was made to plaintiffs of the said sum together with interest thereon from June 12, 1838, amounting in all to $1,506,338.78. The application of $914,026.13 of this payment to principal and the balance to interest was correctly made under the provisions of the resolution of the Senate of September 5, 1850, and was also in exact compliance with the acts of Congress appropriating the money. Subsequently after the affirmation of the decision in the court in Cherokee Nation v. United States, supra, that a further sum of $1,111,284.70 was due plaintiffs on its principal sum, that amount with interest thereon from June 12,1838, was appropriated by Congress and out of the money so appropriated $5,098,361.08 was paid to plaintiffs. The application of this payment was also made in conformity with the resolution of the Senate of September 5, 1850, the acts of Congress appropriating the money, and the decree of this court awarding judgment.
It thus appears not only that plaintiffs’ claim has heretofore been determined and adjudicated on the merits by this court and the Supreme Court and paid in full but that such determination and adjudication was made on a correct statement of the account. Congress has the undoubted power to waive the defense of the former adjudication and vest the court with jurisdiction to readjust the account in any manner Congress may deem just and proper, but it has not seen fit to do so. The jurisdictional act in explicit terms confers jurisdiction on the court to hear, examine, adjudicate, and render judgment in any and all legal and equitable claims of plaintiff, “which claims have not here *210 tofore been determined and adjudicated on thevr merits by the Court of Claims or the Súfreme Court of the United States and paid in full? (Emphasis ours.)
The claim sued upon by plaintiffs, haying been adjudicated by this court and the Supreme Court of the United States on the merits and paid in full, is, under the terms of the jurisdictional act, without the jurisdiction of the court. The petition will therefore be dismissed. It is so ordered.
Whalet, Judge; Littleton, Judge; Green, Judge; and Booth, Chief Justice, concur.